Law Offices of David M. Wacksman
777 Terrace Avenue
Third Floor
Hasbrouck Heights, NJ 07604
(201) 906-0275
(201) 462-9501 (fax)

Jonathan K. Tycko (*pro hac* admission to be sought)
Jeffrey D. Kaliel (*pro hac* admission to be sought)
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, DC 20036
(202) 973-0900
(202) 973-0950 (fax)

Kathryn J. Levy
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, N.W.
Washington, DC 20037
(202) 676-2327
(202) 676-2357 (fax)

*Attorneys for Plaintiffs and the Proposed Class*

| | |
|---|---|
| NADINE HEMY and NANCY CONNER, *individually and on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>PERDUE FARMS, INC., ABC CORPORATIONS 1 through 10 (names being fictitious and unknown but described as those corporations that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) and JOHN DOES 1-10 (names being fictitious and unknown but described as those individuals that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands)<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MONMOUTH COUNTY<br>DOCKET NO.:  MON-L-006003-10<br>CIVIL ACTION<br><br><br>**AMENDED<br>COMPLAINT AND JURY DEMAND** |

## PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Nadine Hemy, residing at 208 Main Street, in the Borough of Matawan, County of Monmouth and State of New Jersey, and Plaintiff Nancy Conner, residing at 61 Abbotsford Road, in the Borough of North Plainfield, County of Somerset and State of New Jersey ("Plaintiffs"), by and through their counsel, complain of the Defendants as follows:

### NATURE OF THE ACTION

1.       This is a proposed class action against: Perdue Farms, Inc. ("Perdue"), ABC Corporations 1-10 (names being fictitious and unknown but described as those corporations that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) and John Does 1-10 (names being fictitious and unknown but described as those individuals that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) ("Defendants") for misleading consumers about the "cage free" and purportedly "humane" treatment of chickens marketed and sold at retail under both its "Perdue" and "Harvestland" brands in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56.8-1 *et seq*. ("CFA") and common law.

2.       Looking to profit from growing consumer awareness of, and concern with, the treatment of farm animals raised for meat production, Defendants engaged in a deceptive and misleading marketing scheme to promote its fresh and frozen chicken as having been raised "humanely".

3.       Starting in September 2009 and continuing to the present (the "Class Period"), Perdue has prominently packaged, labeled, and advertised  its Harvestland brand chicken

products and some of its Perdue brand chicken products as "Humanely Raised" and "Raised Cage Free."

4.     These representations by Perdue are false and/or deceptive and misleading.

5.     Upon information and belief, the "Humanely Raised" claim, which covers the treatment of young meat chickens ("broilers") from hatching through slaughter, is based on Perdue's alleged fidelity to principles outlined in the National Chicken Council's ("NCC") Animal Welfare Guidelines and Audit Checklist for Broilers ("NCC Guidelines").

6.     The NCC is an industry trade group that exists to promote and protect the interests of the chicken industry.  The so-called "welfare" guidelines it promulgates essentially codify the industry norm and do not ensure humane treatment.  Indeed, those guidelines systematically subject chickens to extreme pain.

7.     The NCC Guidelines allow for mechanized brutality and routine infliction of intense duress and pain, as discussed in more detail below.  These practices fall far below the level of treatment that reasonable consumers would find "humane."

8.     Defendant Perdue's packaging, labeling, and advertising also claim that its chickens are "Raised Cage Free" – a representation that is both meaningless and misleading as broiler chickens in the United States are virtually never raised in cages (unlike egg-laying hens).

9.     By promoting its chickens as "Raised Cage Free," Perdue misrepresents to consumers that its chickens are raised differently, and more humanely, than competitors' chickens when this is in fact not the case.

10.     Plaintiffs now bring this suit to end Defendants' false, deceptive, and misleading practices and to recover the ill-gotten gains obtained by Defendants through this deception. Plaintiffs therefore seek, on behalf of themselves and the proposed Class members, declaratory

and injunctive remedies, compensatory, punitive, and statutory damages, and attorneys' fees, costs, and all other related expenses.

## PARTIES

11.     Plaintiff Nadine Hemy is a resident of Matawan, New Jersey. On several occasions, Plaintiff Hemy purchased Defendants' Harvestland products at B.J.'s Wholesale Club, 1007 U.S. 9, Old Bridge, New Jersey 08857, during the Class Period based upon the representations that the Harvestland chicken was "Humanely Raised" and that such treatment was certified by the USDA.   For example, on July 26, 2010, Plaintiff Hemy purchased Harvestland boneless chicken breasts and other Harvestland chicken products. On July 13, 2010, Plaintiff Hemy purchased Harvestland boneless chicken breasts. And on both May 14, 2010 and July 6, 2010, Plaintiff purchased Harvestland chicken products.

12.     Plaintiff Hemy relied upon this deceptive and misleading claim in making her decision to purchase the Harvestland chicken.

13.     Plaintiff Hemy suffered injury in that she would not have bought the premium-priced chicken labeled "Humanely Raised" had she known the truth that the chicken was not in fact treated humanely or differently from most other chicken on the market, before and during slaughter.

14.     Plaintiff Nancy Conner is a resident of North Plainfield, New Jersey. On several occasions, Plaintiff Conner purchased Defendants' Harvestland products at B.J.'s Wholesale Club, 1601 U.S. 22, Watchung, New Jersey 07069, during the Class Period based upon the representations that the Harvestland chicken was "Humanely Raised," "Raised Cage Free," and that such treatment was certified by the USDA. For example, on February 2, 2010 and February 14, 2010, Plaintiff Conner purchased Harvestland chicken thighs. On March 15, 2010, Plaintiff

4

Conner purchased Harvestland chicken thighs and Harvestland chicken drumsticks.  And on March 21, 2010, Plaintiff Conner purchased Harvestland chicken thighs.

15.     Plaintiff Conner relied upon the deceptive and misleading claims in making her decision to purchase the Harvestland chicken.

16.     Plaintiff Conner suffered injury in that she would not have bought the premium-priced chicken labeled "Humanely Raised" and "Raised Cage Free," had she known the truth that the chicken was not in fact treated humanely or differently from most other chicken on the market, before and during slaughter.

17.     Defendant Perdue, headquartered in Salisbury, Wicimico County, Maryland, is the third largest poultry company in the United States and ranks among the nation's top ten meat processors.

18.     Perdue's business, like most large producers in the industry, is vertically integrated, with Perdue controlling production of its chickens at each stage, including primary breeder operations, hatcheries, feed production and storage, growout operations, processing and cooking plants, transportation, and distribution centers.

19.     Perdue operates facilities in fifteen (15) states, including New Jersey.

20.     Perdue contracts with over 2,250 independent poultry producers to produce over half a billion chickens annually, and processes nearly three billion pounds of chicken each year.

21.     Perdue is the top-selling brand of fresh chicken products in the Eastern United States, and its products are available at retail in stores throughout region, including in grocery stores throughout New Jersey.

22.     Perdue has approximately $4.6 billion in sales annually.

## SUBSTANTIVE ALLEGATIONS

23.     In recent years, consumers have become significantly more aware of and sensitive to the care and treatment of animals raised for meat.

24.     As a result, a movement has developed demanding meat products that are derived from animals treated humanely during their lifetimes and during the slaughter which ends their lives.

25.     Because of high consumer demand for more "humane" meat products and an often-related increase in production costs, these products often command a premium price while simultaneously taking away market share from similar products that do not make claims as to humane treatment.

26.     To garner a corner of the humane market for itself, in September 2009 Perdue began to market and sell chicken products under its Harvestland brand in packaging and with labels that prominently advertised that its chickens are "Humanely Raised" and "Raised Cage Free."  Soon after, Perdue began to market and sell chicken products under its Perdue brand with similar packaging and labeling.  Perdue charged a premium price for chicken it labeled as "Humanely Raised."

27.     As described more fully below, Perdue's "Humanely Raised" and "Raised Cage Free" claims are false, deceptive, and misleading.

I.      **The NCC Guidelines**

28.     Upon information and belief, Perdue's "Humanely Raised" claim is based primarily upon the standards of treatment set forth in the NCC Guidelines.

29.     The NCC is "a full-service trade association that promotes and protects the interests of the chicken industry," and "a substantial portion of NCC's budget is used to promote

the consumption of chicken and to foster a positive public image for the industry." *See* www.nationalchickencouncil.com/aboutNCC/.   NCC   member   companies   account   for approximately ninety five percent (95%) of meat chickens produced in the United States.

30.     Upon information and belief, the NCC Guidelines were developed not by unbiased third parties, but by the chicken industry itself. Indeed, according to publicly available documents, Dr. Bruce Stewart Brown, Perdue's own Senior Vice President for Food Safety and Quality, headed a small group of industry scientists and veterinarians who worked to develop recent revisions to the NCC Guidelines.

31.     The NCC Guidelines explicitly allow for practices that no reasonable consumer would consider "humane."

32.     Further compounding the circular and obfuscatory character of Perdue's NCC-based "Humanely Raised" claims, the NCC Guidelines are themselves riddled with huge loopholes for nonconformance. Indeed, a poultry producer can still claim to be "in conformity" with the NCC Guidelines even while failing to comply with numerous of their provisions.

33.     For example, the NCC Guidelines include an audit checklist, ostensibly so that companies implementing the program may determine whether or not the Guidelines are being followed. However, the audit checklist simply provides a "benchmark" of performance: while points are assigned for the various standards, there is no minimum score required to pass an audit area or even the entire audit itself.   This means the company itself sets the standard of performance with respect to what constitutes a "passing" score.

34.     Moreover, while the audit checklist identifies certain occurrences as "major non-conformances," none of these occurrences result in the automatic failure of an audit: the checklist simply states in vague terms that the non-conformances must be "corrected" before the

audit of that particular area can move on.  Major non-conformances include: live chicks in the waste stream at hatcheries; survival of chicks after euthanasia (i.e., live chicks suffocating in the trash); abuse of birds during catching and transportation; pre-slaughter holding times greater than 15 hours; live birds in the "Dead On Arrival" bins at the slaughter plant; and birds with uncut carotid arteries proceeding to the scald vat during slaughter.

35.     Indeed, a number of major non-conformances were found during audits of various Perdue facilities used to produce chicken products ultimately marketed as "Humanely Raised." According to publicly available documents, these non-conformances include live chicks in the hatchery waste stream and excessive pre-slaughter holding times in trucks outside processing plants.  Other non-conformances observed during audits of Perdue facilities include improper stunning of birds as they proceed to the neck-cutting machines, ineffective neck-cutting devices, and excessive ammonia levels in the growout sheds.

## II.          Perdue's Treatment of Chickens

36.     No reasonable consumer would expect that chickens who were "humanely raised" would have been traumatized by **painful and terrifying handling and shackling at slaughter plants that can break bones and dislocate joints.**  But in fact the chickens that Perdue raises are subject to being shackled, upside-down, while fully conscious as they are conveyed through the slaughter line at processing facilities.   Studies published in the peer reviewed journal Neuroscience suggest that upside-down leg shackling is painful for the chickens, and this pain is made worse by the fact that many broilers suffer from abnormalities of the leg joints or bones. Moreover, hanging upside-down is a physiologically abnormal posture for chickens, and multiple studies, published in the peer reviewed journal British Poultry Science, have shown that inversion and shackling is traumatic and stressful.   These studies have also shown that

8

approximately 90% of birds flap their wings vigorously when forced into this position, which can lead to broken bones and dislocated joints.

37.     No reasonable consumer would expect that chickens who were "humanely raised" would have been **electrically shocked before being effectively rendered unconscious, if they are at all, by such electric "stunning**." But in fact the chickens that Perdue raises are subject to electric shocking of birds in "stun baths," or vats of electrified water, a common practice that takes place during processing after the birds have been shackled. Scientific studies, including published peer reviewed articles in The Veterinary Record and the Journal of Agricultural Engineering Research, have shown that many birds experience painful electric shocks prior to being stunned due to wing-flapping at the entrance to the stunner. Moreover, studies published in journals such as Poultry Science have shown that the birds may experience electrically-induced paralysis, seizures, and cardiac arrest while still conscious.

38.     No reasonable consumer would expect that chickens who were "humanely raised" would have their **necks cut while fully conscious, and even endure a semi-conscious, slow bleed to death**. But in fact the chickens that Perdue raises are subject to such ineffective neck-cutting.

39.     No reasonable consumer would expect that chickens who were "humanely raised" would have been **drowned and scalded alive while fully conscious**. But in fact the chickens that Perdue raises are subject to fully-conscious drowning in scalding water after the shackled birds have moved past the neck-cutting machines during processing. Ineffective stunning and neck-cutting can allow the birds to regain consciousness while "bleeding out" and enter the "scald vat" while still alive. According to industry magazine WATT Poultry USA, in some plants the rate of this occurring may be as high as 3%. Thus, the NCC Guidelines if followed by

9

all broiler chicken slaughter facilities would nevertheless allow for 3% - or 270,000,000 – of the approximately nine billion broiler chickens slaughtered each year in this country to be scalded alive.

40.     No reasonable consumer would expect that chickens who were "humanely raised" would have been **crammed into stiflingly hot (or painfully cold) trucks for hours as they await slaughter**, with no food or water.  But in fact the chickens that Perdue raises are subject to such conditions, which sometimes lead to the death of chickens before slaughter.

41.     No reasonable consumer would expect that chickens who were "humanely raised" would have been **purposely deprived of sleep, encouraging abnormal growth**.  But in fact the chickens that Perdue raises are subject to continuous or near-continuous lighting in "growout" sheds, resulting in sleep deprivation.   Studies published in British Poultry Science, Avian Diseases, and World's Poultry Science Journal have found that an absence of sufficient periods of darkness per night precludes natural sleep and resting behavior of birds, and exacerbates leg disorders, sudden death syndrome, and mortality levels.  Moreover, the NCC guidelines do not require a minimum lighting intensity.  Dim, nearly continuous lighting may lead to abnormal eye development, causing uncomfortable and potentially painful eye disorders such as glaucoma and buphthalmia.

42.     No reasonable consumer would expect that chickens who were "humanely raised" would have been, as minutes-old chicks, **severely injured or thrown onto the floor by huge machines** during mechanical separation from their shells.  But in fact Perdue's newly-hatched chicks are subject to being severely injured and thrown onto the floor by machines during egg separation.  Industry advisor and welfare expert Dr. Temple Grandin has stated that this activity

should constitute an automatic failure of any welfare audit. Yet this mechanized abuse of newborn chicks does not trigger automatic failure under the NCC guidelines.

43.     No reasonable consumer would expect that chickens who were "humanely raised" would have been **unable to walk more than five feet and exhibiting gait defects**. But in fact the chickens that Perdue raises are provided no relief even if they unable to walk more than 5 feet or exhibit gait defects.

44.     No reasonable consumer would expect that chickens who were "humanely raised" would have **suffered continuously from cardiovascular problems, painful bone deformities, ruptured tendons, and lameness throughout their short lives**. But in fact the chickens that Perdue raises are plagued with chronic health problems. Perdue, like other major chicken producers, selectively breeds meat, or "broiler," chickens for unnaturally fast growth. Emeritus professor John Webster of the University of Bristol School of Veterinary Science has stated that "[b]roilers are the only livestock that are in chronic pain for the last 20 percent of their lives. They don't move around, not because they are overstocked, but because it hurts their joints so much." It is inconceivable that reasonable consumers would deem it "humane" to breed and raise animals so that a full fifth of their lives is spent in chronic pain so severe that it effectively immobilizes them. Perdue takes no steps to mitigate or remedy these health problems for its supposedly "humanely-raised" chickens.

### III.        Perdue's Treatment of Chickens is Standard Industry Practice.

45.     Despite the statements that Perdue's chickens are "Humanely Raised" and "Raised Cage Free," in all relevant respects Perdue treats its chickens in the same manner as other large chicken producers.

46.     Notwithstanding its total failure to treat its chickens in any markedly different way from other major chicken producers, Perdue charges a premium for the products it labels "Humanely Raised" and "Raised Cage Free."

47.     Because a consumer pays more for Harvestland or Perdue chicken products marketed as "Humanely Raised" and "Raised Cage Free" even though such products are in all relevant respects identical to the vast majority of other chicken products which lack a "humane" label, Perdue perpetrates a fraud on its consumers.

48.     With opinion polls showing that consumers are willing to pay more for products they perceive as humane, Perdue chose to deploy false and misleading advertising tactics in order to deceive humane-conscious consumers into buying the same old products – products no different than the majority of other products on the market – instead of actually improving the welfare of the more than half a billion chickens it raises and kills annually.

49.     Upon information and belief, Perdue has not changed the treatment of any of its more than half-billion chickens to increase their well-being, and the purported welfare standards upon which Perdue bases its "Humanely Raised" claim are nothing more than minimal standards developed by the industry itself – including Perdue executive Dr. Bruce Stewart Brown.  These standards, on their face, allow for egregiously inhumane treatment.

50.     Perdue's deceptive marketing and selling of industrially-produced chicken products as "Humanely Raised" and "Raised Cage Free" misleads consumers into thinking that the products are different and "better" than others, implicates important public interests and compromises marketplace integrity, robbing consumers of their right to "vote with their wallets."

IV.          **The Process Verified Program**

51.     Adding to the confusion created by its "Humanely Raised" and "Raised Cage Free" claim, Perdue's labels and advertising prominently feature a shield that indicates that the claim is "USDA Process Verified."

52.     The placement of the USDA shield alongside the "Humanely Raised" and "Raised Cage Free" claim would lead a reasonable consumer to believe that the truth of that claim had been certified by a reputable and unbiased third party.  However, this is not the case.

53.     Perdue has undertaken a vigorous marketing campaign to foster this misconception, touting the fact that USDA has "verified" that its chickens are raised humanely.  Examples of these marketing tactics include:

> A.     conspicuous in-store placement of signs, placards, and brochures containing statements such as "We've always known our Perdue chicken is good and with our new USDA Process Verified seal, now we know it's Verifiably Good;"
>
> B.     a new website and Facebook page that boasted Perdue's status as "the only poultry company with third-party audits by the USDA to ensure the humane treatment of [its] birds," assuring consumers that the USDA Process Verified shield means they "can have full confidence in the way we raise our chickens," and urging shoppers to "look for third-party verification of any non-USDA defined term used on poultry packaging;"

C.      a television commercial featuring Perdue President and CEO Jim Perdue

boasting Perdue's status as the first chicken company to carry the USDA

Process Verified Program's "premier third party stamp of approval;"

D.      a "Perdue Verifiably Good" online cooking contest with the winner

receiving a cash prize and free Perdue chicken for life; and

E.      media and press statements explaining the shield as the "premiere third-

party stamp of approval" and "an added level of assurance for consumers'

letting them know that the chicken they are buying is . . . humanely

raised."

54.     Moreover, Perdue has made statements in New Jersey newspapers and directly to consumers that the USDA Process Verified shield means that USDA has found that Perdue's treatment of its chickens exceeds industry standards.  *See, e.g.*, MaryAnn Spoto, "Humane Society Member in New Jersey Accuses Perdue Farms of Not Being Truthful About Bird Treatment," THE NEW JERSEY STAR-LEGER (Nov. 30, 2010), *available at* http://www.nj.com/news/index.ssf/2010/11/perdue_faces_lawsuit_brought_u.html (last accessed February 6, 2011) (quoting Perdue spokesman Luis Luna as saying that "[t]he USDA Process Verified Program, which is audited by the USDA, verifies that we are exceeding the industry standards").

55.     These representations by Perdue about the Process Verified Program are misleading to consumers.

56.     Investigation by counsel has revealed that the USDA Process Verified shield is not the product of a neutral evaluation of the treatment of Perdue's chickens, but rather a marketing tool used in conjunction with the USDA Agricultural Marketing Service's ("AMS")

Process Verified Program. AMS is not a regulatory agency, but a marketing agency whose mission is to increase the sales of farmed products.

57.     Under the voluntary Process Verified Program, the specific "processes" to be "verified" (in this case the treatment of Perdue's chickens from hatchery through slaughter) are determined and defined by the company itself.   According to a publicly available procedural guidance document for the Process Verified Program, dated July 10, 2009, "[p]rocess verified points must not be . . . a standard under which clients in the same industry generally operate."

58.     Once AMS verifies, via desk and on-site audits, that the company is following its voluntary, self-defined processes, the company may use the Process Verified Shield in its marketing.

59.     In the context of Perdue's "Humanely Raised" and "Raised Cage Free" claim, the Process Verified shield simply indicates that AMS has found that Perdue, like the majority of poultry producers in the country, has implemented a program based on the NCC Guidelines at its hatcheries, growout facilities, and slaughter plants. It does not mean AMS or any other service within USDA deems Defendants' conduct to be in fact humane.

60.     Indeed, the USDA has specifically disclaimed any authority to define the term "humane" with respect to the treatment and slaughter of poultry.

## CLASS ALLEGATIONS

61.     Plaintiffs bring this lawsuit on behalf of themselves and the proposed class members under R. 4:32-1(a) and (b) (3). The proposed Class consists of:

> All persons who purchased any Harvestland or Perdue product labeled "Humanely Raised" and/or "Raised Cage free" during the period September 2009 to present in the State of New Jersey (the "Class").

62.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or Amended Complaint.

63.     Specifically excluded from the Class are officers and directors of the Defendants, members of the immediate families of the officers and directors of the Defendants, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.

64.     At this time, Plaintiffs do not know the exact number of Class members; however, given the immense sales volume of Perdue and Harvestland chicken products, Plaintiffs believe that Class members are so numerous that joinder of all members of the Class is impracticable.

65.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants labeled, marketed, advertised and/or sold its Harvestland and Perdue chicken products to Plaintiff and those similarly situated using false, misleading and/or deceptive statements or representations, including statements or representations concerning the humane treatment of animals used in the production of such products;

(b) Whether Defendants misrepresented material facts in connection with the sales of its chicken products;

(c) Whether Defendants participated in and pursued the common course of conduct complained of herein;

(d) Whether Defendants' marketing, advertising, labeling, and/or selling of its Harvestland and Perdue products as "Humanely Raised" and "Raised Cage Free" constitutes a deceptive act or practice in the conduct of business, trade, or commerce in New Jersey; and

(e) Whether Defendants were unjustly enriched.

(f) Whether Defendants breached an express warranty.

66.     Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased a Harvestland or Perdue product bearing the "Humanely Raised" and "Raised Cage Free" packaging or label in a typical consumer setting and sustained damages from Defendants' wrongful conduct.

67.     Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in litigating complex class actions. Plaintiffs have no interests that conflict with those of the Class.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

69.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

70.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual actions may be dispositive of the interests of the Class, although certain Class members are not parties to such actions.

71.     Defendants' conduct is generally applicable to the Class as a whole and Plaintiffs seek, inter alia, equitable remedies with respect to the Class as a whole. As such, Defendants' systematic policies and practices make injunctive and declaratory relief with respect to the Class as a whole appropriate.

## COUNT I
### (Violation of the New Jersey Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1 *et.seq.*)

72.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth verbatim and at length herein.

73.     Defendants' marketing of its chicken products as "Humanely Raised" and "Raised Cage Free" constitutes a deceptive and misleading act in violation of the New Jersey Consumer Fraud Act, N.J.S.A. §56:8-1 et seq.

74.     As set forth above, the packaging, labeling, and advertising of Perdue's chicken products as "Humanely Raised" is false, deceptive and misleading because they cause consumers to believe that Perdue's products are different from those of its competitors in that the animals it uses are treated humanely before and during slaughter.  Perdue's claim that its birds are raised "Cage Free" is deceptive and misleading because they cause consumers to purchase Perdue's products believing they were different than those of other producers when, in fact, they were not.

75.     Perdue's "Humanely Raised" and "Raised Cage Free" chickens are not treated humanely or differently from Perdue's other chickens and are not treated in any material respects differently from chickens of other major producers.

76.     Perdue designed the false, deceptive, and misleading packaging, labeling, and advertising with intent to sell, distribute and increase the consumption of its products, including all Harvestland and some Perdue fresh chicken products.

77.     Defendants' violation of the New Jersey Consumer Fraud Act caused Plaintiffs and putative Class members to suffer ascertainable loss. Specifically, Perdue's false, deceptive and misleading packaging, labeling, and advertising caused consumers to purchase, and pay a premium for, Perdue's products believing they were "Humanely Raised" when, in fact, they were not and are not treated differently from Perdue's other chickens or differently in any material respects from chickens of other major producers

WHEREFORE, plaintiffs, NADINE HEMY and NANCY CONNER, demand judgment on this Count against the Defendants, PERDUE FARMS, INC., ABC CORPORATIONS 1 through 10  (names being fictitious and unknown but described as those corporations that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) and JOHN DOES 1-10 (names being fictitious and unknown but described as those individuals that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) as follows:

A.      Declaring this action to be a proper class action pursuant to R. 4:32-1 of a class of all persons who purchased Harvestland or Perdue products packaged, labeled, or advertised as "Humanely Raised" and "Raised Cage Free,"  during the putative Class Period and appointing Plaintiff as representative for the Class and her counsel as Class Counsel;

B.      Enjoining Defendants from pursuing the acts and practices complained of herein;

C.      Declaring that Defendants' marketing of its products as "Humanely Raised" and "Raised Cage Free" is fraudulent, deceptive, and/or misleading, or declaring that such marketing constitutes negligent misrepresentation;

D.     Awarding Plaintiffs and the members of the Class damages, trebled as authorized by the New Jersey Consumer Fraud Act;

E.     Ordering Defendants to pay restitution to Plaintiffs and members of the Class an amount that is the equivalent to the amount acquired by means of any unfair, deceptive, fraudulent, unconscionable, or negligent act employed by Defendants as referenced in this Complaint, or any other amount authorized by statute;

F.     Ordering Defendants to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class as a result of Defendants' false, deceptive or misleading packaging, labeling, and advertising of its "Humanely Raised" and "Raised Cage Free" products or as a result of Defendants' negligent misrepresentation of its products as "Humanely Raised."

G.     Awarding reasonable costs and attorneys' fees, pursuant to the New Jersey Consumer Fraud Act;

H.     Awarding applicable pre-judgment or post-judgment interest; and

I.     Awarding such other and further relief as the Court may deem necessary or appropriate.

## COUNT II
### (Fraud)

78.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth verbatim and at length herein.

79.     Defendants have marketed and sold chicken products under both its Perdue and Harvestland brands accompanied by advertisements and with packaging and labeling prominently displaying claims that the chickens were "Humanely Raised." This claim is false and was known to be false when made, and constitutes fraud.

20

80.   The elements of common law fraud include the following: 1) the Defendants made a material misrepresentation of a presently existing or past fact; 2) the Defendants made the misrepresentation with knowledge or belief that it was false; 3) the Defendants made the misrepresentation with the intent that the plaintiff rely upon the fact; 4) the plaintiff reasonably relied on the fact; and 5) as a result of the reliance, the plaintiff suffered damages.

81.   Defendants represented, marketed, and sold its chicken products as "Humanely Raised" when, in fact, they were not.  Defendants knew its "Humanely Raised" claim to be false regarding the products it so labeled.  Defendants knew or had reason to know that a growing number of consumers are concerned with the treatment of animals raised for food and are willing to pay a premium for food products they perceive to be humane, and that claims of humane treatment carry a special significance for these consumers.

82.   Defendants knew or believed that a reasonable consumer would not consider the manner in which its chickens are raised and slaughtered to be "humane."  Defendants were fully aware of the practices by which it raises and slaughters its chickens, and knew that these practices were no different than those of other major chicken producers in the United States or different from how Perdue handled its other chickens.  Defendants knew that reasonable consumers, concerned with the manner in which farm animals are often treated by large producers, seek out products distinguished as "humane" because they consider those products to be different than, and preferable to, products without that distinction.

83.   Defendants intended that consumers rely on the claim that its chickens were "Humanely Raised," and that such claim would induce consumers to buy their products for a premium price.  Defendants deliberately led consumers, including Plaintiff and the putative

Class, to believe the falsity that the products they were purchasing were raised "humanely" and therefore differently, than competitors' products or their own other products.

84.     Plaintiffs and the putative Class relied on Defendant's claims that its chickens were "Humanely Raised." Plaintiffs and the putative Class' reliance was reasonable on its face, particularly given the appearance and labeling of the products, including the presence of the USDA Process Verified Shield.

85.     Defendant's fraudulent conduct damaged Plaintiffs and the putative Class. Plaintiffs and the putative Class suffered damages because they were deceived into buying and paying a premium for chicken products that they believed to be humanely raised, and therefore different from the majority of similar products on the market, when in fact they were not. Neither Plaintiffs nor any putative Class member would have purchased Defendant's products had they known the truth.

WHEREFORE, plaintiffs, NADINE HEMY and NANCY CONNER, demand judgment on this Count against the Defendants, PERDUE FARMS, INC., ABC CORPORATIONS 1 through 10  (names being fictitious and unknown but described as those corporations that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) and JOHN DOES 1-10 (names being fictitious and unknown but described as those individuals that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) as follows:

A.     Declaring this action to be a proper class action pursuant to R. 4:32-1 of a class of all persons who purchased Harvestland or Perdue products packaged, labeled, or advertised as "Humanely Raised," and "Raised Cage Free" during the putative Class

Period and appointing Plaintiff as representative for the Class and her counsel as Class Counsel;

B.      Enjoining Defendants from pursuing the acts and practices complained of herein;

C.      Declaring that Defendant's marketing of its products as "Humanely Raised" and "Raised Cage Free" is fraudulent, deceptive, and/or misleading, or declaring that such marketing constitutes negligent misrepresentation;

D.      Ordering Defendants to pay restitution to Plaintiffs and members of the Class an amount that is the equivalent to the amount acquired by means of any unfair, deceptive, fraudulent, unconscionable, or negligent act employed by Defendants as referenced in this Complaint:

E.      Ordering Defendants to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class as a result of Defendants' false, deceptive or misleading packaging, labeling, and advertising of its "Humanely Raised" products or  as a result of Defendants' negligent misrepresentation of its products as "Humanely Raised";

F.      Awarding reasonable costs and attorneys' fees;

G.      Awarding applicable pre-judgment or post-judgment interest; and

H.      Awarding such other and further relief as the Court may deem necessary or appropriate.

### COUNT III
### (Negligent Misrepresentation)

86.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth verbatim and at length herein.

87.    Defendants represented, marketed, and sold its chicken products as "Humanely Raised" If not deliberately fraudulent, and in the alternative to that theory, these claims constitute negligent misrepresentations.

88.    Defendants made the false claims without reasonable grounds for believing them to be true.

89.    Plaintiffs and the Class relied on Defendants' misrepresentations of fact when they purchased Defendants' chicken products. Plaintiffs' and the putative Class' reliance was reasonable on its face, particularly given the appearance and labeling of the products, including the presence of the USDA Process Verified Shield.

90.    Plaintiffs and the putative Class suffered damages because they were deceived into buying and paying a premium for chicken products that they believed to be humanely raised, when in fact they were not. Neither Plaintiffs nor any putative Class member would have purchased Defendants' products had they known the truth.

WHEREFORE, plaintiffs, NADINE HEMY and NANCY CONNER, demand judgment on this Count against the Defendants, PERDUE FARMS, INC., ABC CORPORATIONS 1 through 10 (names being fictitious and unknown but described as those corporations that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) and JOHN DOES 1-10 (names being fictitious and unknown but described as those individuals that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) as follows:

A.    Declaring this action to be a proper class action pursuant to R. 4:32-1 of a class of all persons who purchased Harvestland or Perdue products packaged, labeled, or

advertised as "Humanely Raised" during the putative Class Period and appointing

Plaintiff as representative for the Class and her counsel as Class Counsel;

B.     Enjoining Defendants from pursuing the acts and practices complained of herein;

C.     Declaring that Defendants marketing of its products as "Humanely Raised" is

fraudulent, deceptive, and/or misleading, or declaring that such marketing constitutes

negligent misrepresentation;

D.     Ordering Defendants to pay restitution to Plaintiffs and members of the Class an

amount that is the equivalent to the amount acquired by means of any negligent act

employed by Defendants as referenced in this Complaint, or any other amount authorized

by statute;

E.     Ordering Defendants to disgorge any ill-gotten benefits received from Plaintiffs

and members of the Class as a result of Defendants' false, deceptive or misleading

packaging, labeling, and advertising of its "Humanely Raised" products or as a result of

Defendants' negligent misrepresentation of its products as "Humanely Raised"

F.     Awarding reasonable costs and attorneys' fees;

G.     Awarding applicable pre-judgment or post-judgment interest; and

H.     Awarding such other and further relief as the Court may deem necessary or

appropriate.

## COUNT IV
### (Unjust Enrichment)

91.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully

set forth verbatim and at length herein.

92.     Plaintiffs and Class members conferred a benefit on Defendants Perdue when they

purchased Perdue and/or Harvestland brand chicken products with packaging, labeling, and/or

advertising featuring the false, deceptive and misleading "Humanely Raised" and "Raised Cage Free" claims.

93.    Perdue appreciated and had knowledge of the benefit conferred by Plaintiffs and putative Class members.  Indeed, publicly available documents indicate Perdue's "Humanely Raised" and "Raised Cage Free" packaging, labeling, and advertising as generating "a great amount of national interest."

94.    Perdue's acceptance and retention of the benefit conferred by Plaintiffs and putative Class members would be inequitable under the circumstances.

95.    Accordingly, equity and good conscience demand that Defendants should return the benefit conferred by Plaintiffs and putative Class members.

WHEREFORE, plaintiffs, NADINE HEMY and NANCY CONNER, demand judgment on this Count against the Defendants, PERDUE FARMS, INC., ABC CORPORATIONS 1 through 10 (names being fictitious and unknown but described as those corporations that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland") and JOHN DOES 1-10 (names being fictitious and unknown but described as those individuals that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) as follows:

>    A.    Declaring this action to be a proper class action pursuant to R. 4:32-1 of a
>    class of all persons who purchased Harvestland or Perdue products packaged,
>    labeled, or advertised as "Humanely Raised" and "Raised Cage Free" during the
>    putative Class Period and appointing Plaintiff as representative for the Class and her
>    counsel as Class Counsel;

B.      Enjoining Defendants Perdue from pursuing the acts and practices complained of herein;

C.      Declaring that Defendants' marketing of its products as "Humanely Raised" and "Raised Cage Free" is fraudulent, deceptive, and/or misleading, or declaring that such marketing constitutes negligent misrepresentation;

D.      Ordering Defendants to pay restitution to Plaintiffs and members of the Class an amount that is the equivalent to the amount acquired by means of any unfair, deceptive, fraudulent, unconscionable, or negligent act employed by Defendants as referenced in this Complaint, or any other amount authorized by statute;

E.      Ordering Defendants to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class as a result of Defendants' false, deceptive or misleading packaging, labeling, and advertising of its "Humanely Raised" and "Raised Cage Free" products or as a result of Defendants' negligent misrepresentation of its products as "Humanely Raised"

F.      Awarding reasonable costs and attorneys' fees;

G.      Awarding applicable pre-judgment or post-judgment interest; and

H.      Awarding such other and further relief as the Court may deem necessary or appropriate.

## COUNT V
### (Breach of Express Warranty)

96.      Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs above as it fully set forth here.

97.     Plaintiffs, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other members of the putative Class purchased Harvestland or Perdue chicken products with a "Humanely Raised" label.   The terms of that contract include the promises and affirmation of fact made by Defendant on its product labels and through its marketing.  This product labeling constitutes express warranties, became part of the basis of the bargain, and is part of a standardized contact between Plaintiff and the members of the putative Class on the one hand, and Perdue on the other.

98.     All conditions precedent to Perdue's liability under this contract have been performed by Plaintiff and the Class.

99.     Perdue breached the terms of this contract, including the express warranties, with Plaintiff and the putative Class by not providing the product as described on the labeling.

100.    As a result of Perdue's breach of its contract and warranties, Plaintiffs and the putative Class have been damaged in the amount of the difference between the purchased price and price of a comparable non-"humanely-raised" product.

WHEREFORE, plaintiffs, NADINE HEMY and NANCY CONNER, demand judgment on this Count against the Defendants, PERDUE FARMS, INC., ABC CORPORATIONS 1 through 10 (names being fictitious and unknown but described as those corporations that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland") and JOHN DOES 1-10 (names being fictitious and unknown but described as those individuals that assisted, marketed, supplied and/or sold chickens at retail under either the "Perdue" or "Harvestland" brands) as follows:

A.      Declaring this action to be a proper class action pursuant to R. 4:32-1 of a class of all persons who purchased Harvestland or Perdue products packaged,

labeled, or advertised as "Humanely Raised" during the putative Class Period and appointing Plaintiff as representative for the Class and her counsel as Class Counsel;

B.      Enjoining Defendants Perdue from pursuing the acts and practices complained of herein;

C.      Declaring that Defendants' marketing of its products as "Humanely Raised" is fraudulent, deceptive, and/or misleading, or declaring that such marketing constitutes negligent misrepresentation;

D.      Ordering Defendants to pay restitution to Plaintiffs and members of the Class an amount that is the equivalent to the amount acquired by means of any unfair, deceptive, fraudulent, unconscionable, or negligent act employed by Defendants as referenced in this Complaint, or any other amount authorized by statute;

E.      Ordering Defendants to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class as a result of Defendants' false, deceptive or misleading packaging, labeling, and advertising of its "Humanely Raised" products or as a result of Defendants' negligent misrepresentation of its products as "Humanely Raised";

F.      Awarding reasonable costs and attorneys' fees;

G.      Awarding applicable pre-judgment or post-judgment interest; and

H.      Awarding such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of six.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to <u>R</u>. 4:5-1(c) David M. Wacksman, Esq. is hereby designated as trial counsel.

LAW OFFICES OF DAVID M. WACKSMAN
Attorney for Plaintiff and the Proposed Class

BY: _____
            David M. Wacksman

DATED:  February 15, 2011

Jonathan K. Tycko
Jeffrey D. Kaliel
TYCKO & ZAVAREEI LLP

Kathryn J. Levy
THE HUMANE SOCIETY OF THE UNITED STATES

**R. 4:5-1**

The matter in controversy is not the subject of any other action, pending in any court or of a pending arbitration proceeding, and no such action or arbitration proceeding is contemplated.  To the best of plaintiff's knowledge, no other such party should be joined in the within action.

_____
DAVID M. WACKSMAN

DATED:  February 15, 2011