**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NADINE HEMY and NANCY CONNER, individually and on behalf of themselves and all others similarly situated, : : : | |
| Plaintiffs, : : | Civil Action No.: 11-888 (FLW) |
| v. : : | **OPINION** |
| PERDUE FARMS, INC., ABC CORPORATIONS 1 through 10, AND JOHN DOES 1-10, : : : : | R E C E I V E D |
| Defendants. : : : | NOV 3 0 2011 |

AT 8:30_____M
WILLIAM T. WALSH
CLERK

**WOLFSON, United States District Judge:**

This case revolves around allegations that, inter alia, Defendant Perdue Farms, Inc. ("Perdue") inhumanely raised and slaughtered its chickens, yet advertised that its raising of chickens was humane. Presently before the Court is Perdue's motion to dismiss Plaintiffs' Nadine Hemy and Nancy Conner (collectively, "Plaintiffs") putative class action complaint challenging Perdue's advertising practices relating to its "Perdue" and "Harvestland" chicken products. In its motion, Perdue argues that Plaintiffs lack standing to challenge the "Perdue" brand products as opposed to the "Harvestland" products, and further argues that Plaintiffs have failed to adequately plead their claims. Perdue, in the alternative, moves to strike all of Plaintiffs' allegations relating to Perdue's slaughtering practices. Also before the Court is a motion filed by the Animal Welfare Institute ("AWI"), an animal rights activist group, to intervene and stay this putative class action.

1

For the reasons that follow, and as an initial matter, the Court denies AWI's motion to intervene and stay the suit. Concluding that Plaintiffs do not have standing to challenge Defendant's "Perdue" brand chicken products, the Court dismisses Plaintiffs' claims regarding those products with prejudice. The Court, further, grants Defendant's motion to dismiss all claims relating to Harvestland chicken products, as follows. The unjust enrichment (Count IV) claim is dismissed with prejudice. The remaining counts, the New Jersey Consumer Fraud Act ("NJCFA") claim (Count I), common law fraud claim (Count II), negligent misrepresentation claim (Count III), and breach of express warranty claim (Count V), are dismissed without prejudice; Plaintiffs are granted leave to file a Second Amended Complaint, in accordance with this Opinion, within 30 days.

## I.    Background

Plaintiffs generally challenge Perdue's advertising practices, claiming that Perdue misleads consumers about the manner in which it raises and slaughters its chickens.[1]  As this matter comes before the Court on a motion to dismiss, the Court takes the following allegations as true.

### A.    The Amended Complaint

The Amended Complaint alleges that Perdue manufactures both Perdue-branded chicken products and Harvestland-branded chicken products. See Compl., ¶ 1. According to the Amended Complaint, Perdue "prominently advertised" that its Harvestland chicken products, and some of its Perdue-branded chicken products, were "Humanely Raised." Id. at ¶¶ 3, 26. Also according to the Amended Complaint, Perdue charged a premium price for the chicken products labeled "Humanely

---

[1]    The Court has jurisdiction over this suit pursuant to the diversity statute, 26 U.S.C. § 1332.

Raised." Id. at ¶ 27.  According to Plaintiffs' allegations, Perdue bases its advertising claim that its chicken products are "Humanely Raised" on the National Chicken Counsel's ("NCC's") Animal Welfare Guidelines and Audit Checklist for Broilers ("NCC Guidelines").  Id. at ¶ 5.

The NCC is an industry trade group, Plaintiffs' allege, and the NCC Guidelines allow for chickens to be brutally subjected to intense duress and pain in the raising and slaughtering process.  Id. at ¶ 7.  In Plaintiffs' view, this sort of treatment is not "humane."  Id.  Plaintiffs further allege than the NCC Guidelines include an audit checklist that is created by each company, which means that each company determines for itself whether or not it meets the guideline benchmarks.  Id. at ¶ 33.  In short, Plaintiffs allege that the NCC Guidelines fail to provide an independently formed basis for assessing the humaneness of a company's chicken manufacturing practices.

Plaintiffs further allege that, according to publically available documents, audits of various Perdue manufacturing facilities revealed that its "Humanely Raised" chickens were subjected to what Plaintiffs view as horrifying conditions and treatment.  Id. at ¶ 35.  For example, live chicks were found in Perdue's hatchery waste stream, excessive ammonia levels were found in the growout sheds, chickens were held for excessive periods of time in trucks while awaiting slaughter, and Perdue's electrocution process and neck-cutting machines sometimes failed to quickly kill the birds thereby subjecting them to "paralysis, seizures, and cardiac arrest while still conscious."  Id. at ¶¶ 35-37.  In Plaintiffs' view, no reasonable consumer would expect that "Humanely Raised" chickens would have been treated in this fashion.  Id. at ¶ 36.  Plaintiffs assert that, despite Perdue advertising its chicken as "Humanely Raised" in response to increasing consumer demand for products that consumers view as more humane, "[u]pon information and belief, Perdue . . . bases its 'Humanely Raised' claim [on] nothing more than minimal standards developed by the industry itself,"

3

misleading consumers into thinking that Perdue's products differ from non-"Humanely Raised" products and are, therefore, worth their premium price. Id. at ¶¶ 49-50.

In addition, Plaintiffs allege that Perdue advertised its chicken products as "Raised Cage Free." According to Plaintiffs, this is a "meaningless and misleading" claim because broiler chickens, "young meat chicken," in the United States are virtually never raised in cages, unlike egg-laying hens which are raised in that manner. Id. at ¶¶ 5, 8. Thus, in Plaintiffs' view, Perdue's "Raised Cage Free" claim "misrepresents to consumers that its chickens are raised differently, and more humanely, than competitors' chickens when this is in fact not the case." Id. at ¶ 9.

For the "Humanely Raised" and "Raised Cage Free" advertising claims, Plaintiffs assert that Perdue affixes a "USDA Process Verified" shield to its chicken products. Id. at ¶ 51. According to Plaintiffs, the USDA Process Verified program is a marketing tool designed by the USDA's Agricultural Marketing Service ("AMS"). Id. at ¶ 56. Through this voluntary program, AMS reviews a company's internally-generated guidelines and then conducts desk and on-site audits to determine whether the company follows its own guidelines. Id. at ¶¶ 57-58. AMS may not assess the company's practices against the backdrop of industry-wide standards. Id. at ¶ 57.

By placing the shield on the Perdue packaging, juxtaposed with the "Humanely Raised" and "Raised Cage Free" markings, Plaintiffs allege that Perdue misleads consumers into believing that a reputable government agency has independently confirmed the veracity of Perdue's "Humanely Raised" and "Raised Cage Free" claims. Id,. at ¶ 52. In actuality, Plaintiffs assert, the shield merely indicates that a non-regulatory, marketing arm of the USDA, "whose mission is to increase the sales of farmed products,"confirmed that Perdue complied with its own internally-developed manufacturing standards. Id. at ¶¶ 56-57.

4

In addition to affixing the seal to the products themselves, Plaintiffs allege that Perdue embarked upon an aggressive marketing campaign emphasizing the shield. Id. at ¶ 53. This campaign includes in-store placement of signs, placards, and brochures. Id. at ¶ 53. One brochure allegedly stated "We've always known our Perdue chicken is good and with our new USDA Process Verified seam now we know it's Verifiably Good." Id. at ¶ 53A.   Moreover, the Amended Complaint states, Perdue advertised the shield through its website and Facebook page, television commercials, and media and press statements. Id. at ¶ 53. In a New Jersey Star Ledger newspaper article dated November 30, 2010, a Perdue employee allegedly stated that the USDA shield means that the USDA has determined that Perdue's practices exceed industry standards, id. at ¶ 54, a statement Plaintiffs allege is false and misleading. Apart from the newspaper article, the allegations do not state any particular date or location where the aforesaid advertisements were made.

On May 14, 2010, July 6, 2010, July 13, 2010, and July 26, 2010, the Amended Complaint alleges, Plaintiff Hemy purchased Harvestland chicken products, such as boneless chicken breasts, from her local B.J.'s Wholesale Club in Old Bridge, New Jersey.  Compl., ¶ 11.  The chicken products were allegedly marked as "Humanely Raised," and were stamped with the USDA shield. Id.  Plaintiff Hemy allegedly relied on the "Humanely Raised" and USDA markings in deciding to purchase the Harvestland products and, according to the Amended Complaint, "would not have bought the premium-priced chicken . . . had she known the truth that the chicken was not in fact treated humanely or differently from most other chicken on the market, before and during slaughter." Id. at ¶¶ 12-13.

Like Plaintiff Hemy, Plaintiff Conner purchased Harvestland chicken products from her local B.J.'s Wholesale Club.  Id. at ¶ 14.  Her club was located in Watchung, New Jersey, and she

purchased chicken thighs from that location on February 2, 2010, February 14, 2010, and March 21, 2010. On March 15, 2010, she purchased both Harvestland chicken thighs and drumsticks. Id. The product packaging stated that each of the products was "Humanely Raised" and/or "Raised Cage Free." Id. at ¶ 15. The USDA shield was also present on the packaging. According to the Amended Complaint, Plaintiff Conner relied upon this labeling in making her purchase decision; she would not have purchased the "premium priced chicken labeled 'Humanely Raised' and 'Raised Cage Free,' had she known the truth that the chicken was not in fact" raised and slaughtered in that manner. Id. at ¶ 16.

Based on their purchases of the Harvestland products at an allegedly premium price, on November 29, 2010, Plaintiffs filed the instant suit against Perdue in the Superior Court of New Jersey, Monmouth County, Law Division. While the matter was pending in state court, Plaintiffs filed an Amended Complaint on February 15, 2011. Two days later, on February 17, 2011, Defendant Perdue removed the suit to this Court. Thereafter, Plaintiffs filed another Amended Complaint in this Court on February 28, 2011, asserting NJCFA (Count I), common law fraud (Count II), negligent misrepresentation (Count III), unjust enrichment (Count IV), and breach of express warranty (Count V) claims.

Once this Amended Complaint was filed, Perdue filed the instant motion to dismiss or, alternatively, to strike immaterial allegations relating to the slaughter of chickens from Plaintiffs' Amended Complaint. In support of its motion to dismiss, Perdue attached several documents for the Court's consideration. These documents include copies of pages from the USDA Process Verified Program website, the USDA Quality Systems Verification Programs General Policies and Procedures, and a press release by the Humane Society. See Walsh Cert., Exhs. A-D.

6

**B.    Motion to Intervene/Stay**

While the motion to dismiss was pending, the Animal Welfare Institute filed a motion to intervene or, alternatively, to stay this suit.  The Animal Welfare Institute is a non-profit charitable organization that aims to alleviate the suffering of animals. See Jones Decl. ¶ 6.  Through the motion, AWI seeks to stay this proceeding until such time as the National Advertising Division ("NAD") can issue a final ruling on an advertising challenge brought by AWI against Perdue. The following facts relate to AWI's motion, and are undisputed by the parties unless otherwise noted.

The National Advertising Division was created in 1971 by the Council of Better Business Bureaus to provide the advertising industry with a system of self-regulation. See Jones Decl., Ex. 13. The NAD employs attorneys experienced in the areas of advertising, trade regulation, litigation, and arbitration to review the challenges brought before it and to issue decisions accordingly. See id., Ex. 14. Party compliance with the NAD's decision is voluntary.

On June 2, 2010, AWI submitted a challenge to the NAD, asserting that Perdue's "Humanely Raised" and "Raised Cage Free" claims are inaccurate and misleading to consumers.  As noted, Plaintiff Nadine Hemy filed the instant putative class action on November 29, 2010, challenging Perdue's "Humanely Raised" claim. And, when Plaintiffs filed their Amended Complaint in this Court on February 28, 2011, they incorporated the challenge to Perdue's claim that their chickens are "Raised Cage Free."

The NAD Policies and Procedures Section 2.2(B)(i)(b) provides: "If . . . during the course of an advertising review proceeding, [NAD] concludes that the advertising claims complained of are: . . . (b) the subject of pending litigation or an order by the court . . . [NAD] shall administratively close the case file . . . ." Jones Decl., Ex.16.  Pursuant to this policy, on March 2, 2011, the NAD

7

administratively closed its investigation of Perdue. See Walsh Decl., Ex. D.  The NAD stated that it would consider reopening the investigation at the request of one of the parties "should the court fail to reach a final determination on the truthfulness and accuracy of the challenged claims." Jones Decl., Ex. 13.  Five months after the NAD administratively closed the AWI file, AWI filed its motion to intervene in this Court on August 4, 2011.

## II.    Standard of Review - Motion to Dismiss

The Federal Rules of Civil Procedure provide that a complaint "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a). The purpose of a complaint is "to inform the opposing party and the court of the nature of the claims and defenses being asserted by the pleader and, in the case of an affirmative pleading, the relief being demanded." Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1182 (3d ed. 2004).

When reviewing a motion to dismiss, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 561 (quoting Conley, 355

U.S. at 45–46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 555. As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest 'the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element'." Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556).

In affirming that Twombly standards apply to all motions to dismiss, the Supreme Court recently explained the following principles. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S.Ct. at 1950. The plausibility standard requires that "the plaintiff plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 556). Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Fowler, 578 F.3d at 211.

In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). "The purpose of this rule is to avoid the situation where a plaintiff

9

with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document." Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004) abrogated on other grounds by Twombly, 550 U.S. at 561–63.  Importantly, however, while the Court may rely on these sort of documents in ruling on a motion to dismiss, none can be considered for truth of the matter asserted therein. Id.  With respect to public documents, the Court may take judicial notice of those records to establish the existence of a fact but not for the truth of the facts asserted in that record. Id.

Here, Defendant Perdue has attached exhibits of USDA documents relating to the USDA Process Verified Program as well as an article from The Humane Society's website. For example, Exhibit C to the Walsh Certification, attached to Perdue's moving brief, is a printout from the Process Verified Program's website that lists manufacturers authorized to affix the program seal to their products.  The Court may take judicial notice that Perdue is named on that list, but not for the truth of whether Perdue has actually complied with the dictates at the USDA program.

Perdue also attaches documents attesting to the nature of the Process Verified Program, such as the program's policies and procedures. The program's policies and procedures are expressly referenced in the Plaintiffs' Amended Complaint, although Plaintiffs do not specify the name of the document from which they derived the policies and procedures. See Compl., ¶ 57 (alleging that the Process Verified Program has made available a procedural guidance document, dated July 10, 2009, stating that "[p]rocess verified points must not be . . . a standard under which clients in the same industry generally operate").  The document Perdue attaches is titled Quality Systems Verification Programs General Policies and Procedures, and is dated November 14, 2008. Based on the differing dates of publication, the document referenced in Plaintiffs' allegation does not appear to be the exact

10

same document Defendant attached. Nonetheless, since the Amended Complaint's allegations incorporate and reference the Process Verified Program's policies and procedures, the Court may rely upon Defendant's exhibit where relevant.

In addition, Perdue has attached a copy of a press release issued by The Humane Society, which document acknowledges that The Humane Society filed the instant putative class action. See Walsh Cert., Exh. D. This document, unlike the USDA documents, is not a public record, nor is it a document that Plaintiffs rely upon in their Amended Complaint. Thus, the Court may not take judicial notice of or consider this document in connection with Perdue's motion to dismiss.

Finally, after briefing on the motion was completed, Perdue forwarded a copy of a USDA ruling on allegations similar to those made by Plaintiffs here, which was brought before the USDA by Tyson Foods, Inc., another producer of chicken products, against Perdue. See Walsh Ltr. dated August 26, 2011. I also may not consider this document for the truth of the matters asserted therein, on a motion to dismiss, because it is not a public record, and Plaintiffs' claims are not based upon the USDA ruling.[2]

## III. Discussion

As noted, Animal Welfare Institute moves to intervene, or in the alternative, for a stay. Because the granting of a stay would postpone my ruling on Perdue's motion to dismiss, I will first address AWI's motion—its motion for permissive intervention and to stay the proceedings.

### A. Motion to Intervene or, in the Alternative, Stay

#### 1. Permissive Intervention

---

[2] Because I will not rely on this document in connection with the instant motion to dismiss, I need not address Plaintiffs' letter request that I strike the document.

Pursuant to Fed. R. Civ. P. 24(b), a person or an entity, who is not a named party in an action, may seek to intervene in the interested litigation. See PA Prison Soc. v. Cortes, 622 F.3d 215, 232 (3d Cir. 2010). Rule 24(b) provides:

> [U]pon timely application anyone may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common .... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b). In short, then, a proposed intervenor must show that: (1) its motion is timely; (2) it has questions of law or fact in common with the anchoring suit; and (3) intervention will not cause undue delay or prejudice for the original parties. If a third party can satisfy all of these requirements, the court may, in its discretion, grant that third party permissive intervention.

### a.    Timeliness

To assist lower courts in making a timeliness determination, the Third Circuit has provided three factors for courts to consider: (1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay.    In re Fine Paper Antitrust Litigation, 685 F.2d 810 (3d Cir. 1982); Glover v. Ferrero USA, Inc., No. 11–1086, 2011 WL 5007805, *3 (D.N.J. Oct. 20, 2011) (citing same). See generally James W. Moore, 3B MOORE'S FEDERAL PRACTICE § 24.13 (timeliness is not merely a function of when the motion was filed relative to the filing of the action). Here, although the NAD administratively closed AWI's file on March 2, 2011, AWI waited more than five months to move this Court for intervention.[3] Courts have found shorter time frames, such

---

[3]    I focus on the date of the administrative closure, as opposed to the filing of Plaintiffs' initial complaint in state court because AWI had no reason to move to intervene until after the NAD administratively closed the AWI file. See United States v. Alcan Aluminum, Inc., 25 F 3d 1174, 1182 (3d Cir. 1994) (stating that timeliness "should be measured from the point which an applicant

as two months, timely. See Glover, 2011 WL 5007805 at *3. But AWI has not pointed to any cases in which a five month delay was also deemed timely.

On the other hand, this suit is still in its infancy; the parties have not engaged in extensive discovery. For that same reason, one could argue that the parties would not suffer great prejudice should the Court grant AWI the right to intervene. In addition, in terms of its reason for the delay, AWI argues that it was communicating with the parties in an effort to convince them to agree to a voluntary stay during the five months following the NAD administrative closure. On balance, taking into consideration the three timeliness factors, I conclude that the motion was timely filed.

**b.    Common Claim or Defense**

The first prong of Rule 24(b) requires that the proposed intervenor demonstrate a "claim or defense" sharing common questions of law or fact with the claims of the original parties. Fed. R. Civ. P. 24(b)(1)(B). AWI concedes that it has no common claim or defense here, but argues that it need not satisfy this criterion because it may intervene for the limited purpose of seeking a stay.[4] AWI cites no direct authority for this proposition, citing instead to easily distinguishable authority. See, e.g., Pansy v. Borough of Stroudsburg, 23 F.3d 772 (3d Cir. 1994) (granting intervention so newspaper could access confidential records). AWI's most analogous citation is to U.S. ex rel.

_____

knows, or should know, its rights are directly affected by the litigation"). Prior to NAD's closure of the file, AWI likely believed that its legal concerns would be adequately addressed in the NAD proceeding.

    [4]    Some courts have held that the failure to attach a pleading asserting a claim or defense is, alone, a basis for denying a motion to intervene. See, e.g., Lexington Ins. Co. v. Caleco, Inc., No. 01-5196, 2003 WL 21652163, *5 (E.D.Pa. Jan 25, 2003); Fed.R.Civ.P. 24(c)("A motion to intervene must . . . state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.").

Frank M. Sheesley Co. v. St. Paul Fire and Marine Ins. Co., 239 F.R.D. 404 (W.D.Pa. 2006), which granted a third-party motion for permissive intervention for the purpose of seeking a stay pending arbitration. But even Sheesley is distinguishable; in that case, the pre-existing arbitration shared the same factual history, involved identical questions of law, and, importantly, any judgment awarded in the arbitration could affect the parties' rights in the litigation. Here, in contrast, the NAD proceeding is entirely voluntary and would not substantially impact or dispose of the claims in the instant suit. Moreover, Sheesley emphasizes that Rule 24(b), unlike intervention as of right under Rule 24(a), "is expressly . . . concerned with consolidating common legal or factual issues ...." Id. at 414.

Lastly, in my view, the Plaintiffs here adequately represent the public's interest in ensuring that poultry manufacturers do not misrepresent how chickens are treated. AWI has not articulated any additional strong public policy that its intervention would further. Thus, I do not find that AWI has pointed to a common claim or defense or a strong public policy that would justify intervention in this case. Accordingly, this factor weighs against intervention.

### c.    Undue Delay and Prejudice

Finally, the Court must consider whether intervention would cause undue delay or prejudice for the original parties. Fed. R. Civ. P. 24(b)(3). One could argue that intervention for the purpose of seeking a stay would not prejudice the parties because this suit is still in its infancy. On the other hand, however, there is a pending motion to dismiss in this matter, which presents colorable bases for dismissing certain of Plaintiffs' claims. To require Defendant to await the results of a non-binding proceeding would prejudice its interest in having an expeditious resolution of the claims against it.

14

In this connection, Defendant points to language in <u>Kamerman v. Steinger</u>, 681 F. Supp. 206 (S.D.N.Y. 1988):

> Ordinarily, a person desiring to intervene seeks to join a pending action either as a plaintiff or as defendant. The federal rules therefore require that the applicant "set forth the claim or defense for which intervention is sought." Fed.R.Civ.P. 24(c). If the application is granted, the intervenor is "treated as if he [or she] were an original party...." The movants here, on the other hand, do not seek to join this action as either plaintiffs or as defendants. They have no claim to press against defendants; nor have they any defense to assert against plaintiffs. In fact, they have no intention whatsoever of litigating the causes of action asserted in the federal complaint. Their sole purpose in submitting their motion is to delay the prosecution of the federal action. With this goal in mind, they dress in the language of Rule 24 what is in reality an application for some special status permitting them to press their motion for a stay. For this reason alone, the court believes that the application to intervene should be denied.

<u>Id.</u> at 211 (internal quotations omitted and emphasis added).   Like the movants in <u>Kamerman</u>, AWI attempts to characterize the "limited" terms of its permissive intervention as a minor inconvenience, with worthwhile rewards for this court.   However, whether or not AWI intends to delay this proceeding, the effect of granting its request for intervention for the purpose of staying the litigation would have that result.   Therefore, I conclude that granting AWI's motion would result in undue delay and prejudice in this case.

Taken together, considering the totality of the factors discussed above, I deny AWI's motion for permissive intervention.   Although the motion was timely, the remaining factors do not weigh in favor of granting is motion.   Thus, I will not exercise my discretion under Rule 24(b) to permit it to intervene.

### 2.      Stay

Having concluded that I will not exercise my discretion to permit AWI to intervene, I need

not consider AWI's alternative request for a stay.  Nonetheless, in the interest of completeness, I address AWI's request.  AWI argues that this Court's imposition of a stay would provide the NAD with a sufficient basis, under its internal rules, for reopening the AWI file.  Whether or not this is true, I conclude that a stay is not appropriate.

It is well-established that a District Court maintains "broad power to stay proceedings." Bechtel Corp., v. Local 215 Laborers' International Union of North America, 544 F.2d 1207, 1215 (3d Cir. 1976).  The Third Circuit has explained that "[t]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." Id. (quoting Landis v. North American Co., 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936)).  Moreover, "[i]n the exercise of its sound discretion, a court may hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or be dispositive of the issues." Bechtel, 544 F.2d at 1215.

I will not exercise my inherent authority to stay the instant suit.  While the NAD proceeding involves similar factual issues, the resolution of that proceeding will have no bearing on this case. AWI argues that granting a stay will permit it to further pursue its claim before the NAD, but with the motion to intervene having been denied, AWI is not party to this suit and the effect of a stay on its rights is not pertinent to my decision.  Moreover, it is the NAD's rules that dictated that AWI's proceeding had to be administratively closed—not any ruling of this Court.  In addition, the Court's inherent discretion to stay is to be utilized for the purpose of promoting judicial economy and efficiency.  Granting a stay while Defendant's motion to dismiss is pending would not promote

efficiency, and could potentially prolong resolution of claims and narrowing of issues for any future trial. Accordingly, I deny AWI's motion to stay.

### B.    Motion to Dismiss

Defendant Perdue argues two bases for why Plaintiffs' Amended Complaint should be dismissed.[5]   First, Perdue argues that Plaintiffs lack standing to challenge the "Perdue" brand products as opposed to the "Harvestland" products.   Second, Perdue challenges each substantive count as insufficiently pled.   In that connection, I note that the Amended Complaint does not make clear which advertising claims are linked to which substantive legal claims.   Most, but not all, counts refer specifically to the "Humanely Raised" and "Raised Cage Free" only claims.   See e.g., Compl., ¶¶ 72-77.   However, reading the Amended Complaint as a whole, Plaintiffs appear to incorporate the "USDA Process Verified Label" advertisement as well, alleging that the coupling of that label with the "Humanely Raised" and "Raised Cage Free" wording is further misleading.   For the sake of thoroughness, and in light of the standard of review on a motion to dismiss, the Court will consider all three advertising claims in connection with each substantive count unless it is clear from the allegations relating to a particular count that the Plaintiffs intended to limit the count to certain advertising claims.   Further, Perdue argues that, should its motion to dismiss not be granted, Plaintiffs' allegations relating to Perdue's slaughtering practices are irrelevant and should be stricken from the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(f).

Because the standing issue is threshold in nature, I turn first to that argument and then turn

---

[5]        As an initial matter, I note that the parties submitted thorough briefing, which briefing I found to be of great assistance to me in reaching my decision.   However, both parties cited many non-precedential decisions throughout their briefs—too many for me to address here.   In light of the voluminous citations, and the non-precedential nature of that authority, I will not address each case cited.

17

to the substantive counts. Ultimately, I need not reach Perdue's motion to strike because I conclude that its motion to dismiss should be granted.

### 1.    Standing

To bring a suit in federal court, a plaintiff must have standing pursuant to Article III of the United States Constitution. To establish standing under Article III, a plaintiff must show: (1) injury in fact; (2) causation; and (3) redressability. Horvath v. Keystone Health Plan E., Inc., 333 F.3d 450, 455 (3d Cir. 2003); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish an injury in fact, a plaintiff must demonstrate the "invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 561 (internal citations omitted). In addition, "there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... [the] result [of] the independent action of some third party not before the court." Id. Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. See also Lieberson v. Johnson & Johnson Consumer Companies, Inc., --- F.Supp.2d ----, 2011 WL 4414214, *4 (D.N.J. Sept. 21, 2011).

Importantly, and in relevant part, "[t]he injury must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 561. The longstanding basic rule of third party standing is that "[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991). Courts "apply this prudential rule against third party standing even when the requirements of Article III have been met, to 'avoid deciding questions of

broad social import ... [and] to limit access to the federal courts to those litigants best suited to assert a particular claim.' " Pitt News v. Fisher, 215 F.3d 354, 362 (3d Cir. 2000) (citing Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). Moreover, "[t]he standing inquiry does not change in the context of a putative class action.... [S]tanding cannot be predicated on an injury which the plaintiff has not suffered, nor can it be acquired through the back door of a class action." Koronthaly v. L'Oreal, Civ. A. No. 07–CV–5588, 2008 WL 2938045, at *4 (D.N.J. July 29, 2008)(quotations omitted). As explained by the Supreme Court in Lewis v. Casey, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), "[t]hat a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (quotations omitted).

Here, Perdue argues that Plaintiffs Hemy and Conner lack standing to pursue their claims as to the "Perdue" brand chicken products (as opposed to the "Harvestland" chicken products) because neither Plaintiff alleges that she purchased any Perdue products under the "Perdue" brand name. See Def. Open. Br. at 23. Defendant is correct that, in the Amended Complaint, Plaintiffs do not limit their allegations to only "Harvestland" chicken products; they challenge Perdue's labeling and use of certain advertisements for both the "Harvestland" and "Perdue" branded chicken products. See e.g., Compl., ¶¶ 77A, 85A (describing products as "Harvestland or Perdue products").[6]  Notably, while there are allegations that each Plaintiff purchased Harvestland chicken products, id. at ¶¶ 11,

---

[6]      In addition, Plaintiffs seek to represent "[a]ll persons who purchased any Harvestland or Perdue product labeled 'Humanely Raised' during the period September 2009 to present in the State of New Jersey." Compl., ¶ 61 (emphasis added).

14, there is no allegation that either Plaintiff purchased "Perdue" brand chicken products.

Plaintiffs' failure to allege that they purchased the "Perdue" brand chicken products is a critical omission because, without asserting that they purchased "Perdue" brand products, Plaintiffs have failed to sufficiently allege an injury-in-fact with respect to those products. Plaintiffs argue that, while they did not allege that they purchased "Perdue" brand products, other potential class members may have purchased such products. However, as various courts have explained, a plaintiff in a class action must show that she has personally been injured; the class plaintiff cannot rely on "injuries suffered by other, unidentified members of the class." Lieberson, supra at *4. For this reason, Plaintiffs' claims will be limited to only the Harvestland chicken products. Accordingly, Plaintiffs' challenges to the "Perdue" brand products are hereby dismissed with prejudice and, for purposes of this motion, the Court will consider only Plaintiffs' allegations with regard to the Harvestland brand products.[7]

### 2.   NJCFA

The NJCFA provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is

---

[7]      While the named Plaintiffs cannot assert claims against the Perdue brand chicken products, the Court makes no ruling here whether an additionally named Plaintiff who claims injury from the purchase of these products may assert a claim regarding those products. See Coyle v. Hornell Brewing Co., Civil No. 08–2797, 2011 WL 3859731, *4 (D.N.J. Aug.30, 2011) (dismissing named plaintiff based on an absence of qualifying purchases and holding that counsel could qualify as class counsel if they were able to find a suitable class plaintiff).

declared to be an unlawful practice.

N.J.S.A. § 56:8–2. The term "person" as used in the NJCFA includes, <u>inter alia</u>, natural persons, partnerships, corporations, companies, trusts, business entities and associations. N.J.S.A. § 56:8–1(d).

To state a <u>prima facie</u> case under the NJCFA, a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss. <u>Lieberson</u>, 2011 WL 4414214 at *5 (citing <u>Bosland v. Warnock Dodge, Inc.</u>, 197 N.J. 543, 964 A.2d 741, 749 (2009)). Unlawful practices under the NJCFA fall into three general categories: affirmative acts, knowing omissions, and regulation violations. <u>Frederico</u>, 507 F.3d at 202 (quotation omitted). Intent to defraud is not necessary to show unlawful conduct by an affirmative act of the defendant, but is an element of unlawful practice by knowing omission of the defendant. <u>See</u> <u>Gennari v. Weichert Co. Realtors</u>, 148 N.J. 582, 691 A.2d 350 (1997); <u>Torres–Hernandez v. CVT Prepaid Solutions, Inc.</u>, No. 08–1057, 2008 WL 5381227, at *6 (D.N.J. Dec.17, 2008). Here, Plaintiffs' allegations appear to fall under the affirmative act category.

In the Amended Complaint, Plaintiffs allege that Perdue's advertisement of their Harvestland chicken products as "Humanely Raised" and "Raised Cage Free," along with (in some instances) the USDA Process Verified Program seal was misleading. For the "Humanely Raised" claim, Plaintiffs allege that, despite its claim to the contrary, Perdue did not, in fact, humanely raise and slaughter its chickens. For the "Raised Cage Free" advertisement, Plaintiffs allege that the advertisement was misleading because it suggests that uncaging broiler chickens is a value-added feature when, in actuality, neither its nor any other manufacturer's broiler chickens were typically caged. Finally,

with respect to the USDA Process Verified Program seal, Plaintiffs allege that Perdue's use of the seal, juxtaposed next to either the "Humanely Raised" or "Raised Cage Free" claims, created the false impression that those latter claims had been independently verified by a neutral government agency. Relatedly, Plaintiffs further allege that Perdue advertised, through in-store signs, placards, websites, and other media, that the USDA independently verified its treatment of chickens.

In response, Perdue generally argues that Plaintiffs fail to allege sufficient factual bases in support of the allegations that the "Humanely Raised" and "Raised Cage Free" labels are misleading. Perdue, further, argues that its use of the USDA Process Verified Program seal is permitted by the USDA service in charge of administering the program. Moreover, Perdue argues that Plaintiffs have failed to satisfy the Federal Rule of Civil Procedure 9(b) heightened pleading standard. For the "Humanely Raised" allegations, in particular, Perdue challenges the Plaintiffs' incorporation of slaughter allegations in support of Plaintiffs' claim that the chickens were raised inhumanely. Finally, Perdue argues that Plaintiffs have failed to sufficiently allege ascertainable loss, materiality, and causal connection —each requisites of an NJCFA claim. I turn first to Perdue's Rule 9(b) argument.

### a.      Pleading under Rule 9(b)

It is well-established that NJCFA claims must meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). See, e.g., Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007); Arcand v. Brother Intern. Corp., 673 F.Supp.2d 282 (D.N.J. Nov.30, 2009). To satisfy this heightened pleading standard, a plaintiff "must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.' Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or

otherwise inject precision or some measure of substantiation into a fraud allegation." <u>Frederico</u>, 507

F.3 at 200.   Indeed, the Third Circuit has advised that, at a minimum, a plaintiff must support

allegations of fraud with all the essential factual background that would accompany " 'the first

paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at

issue." <u>In re Suprema Specialties, Inc. Sec. Litig.</u>, 438 F.3d 256, 276–77 (3d Cir. 2006) (citations

omitted) <u>abrogated on other grounds by</u> <u>Tellabs, Inc. v. Makor Issues & Rights, L.T.D.</u>, 551 U.S.

308, 322-23, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).   A complaint must do more than assert

generalized facts, it must allege facts specific to the plaintiff. <u>Rolo v. City Investing Co. Liquidating</u>

<u>Trust</u>, 155 F.3d 644, 658–59 (3d Cir. 1998) <u>abrogated on other grounds by</u> <u>Rotella v. Wood</u>, 528

U.S. 549 (2000) (where the complaint failed to allege "what actually happened to either" of the

plaintiffs, the complaint did not plead "fraud with the specificity required by Rule 9(b)").

In assessing whether Plaintiffs' allegations satisfy Rule 9(b)'s heightened pleading standard,

I separately address each of the allegedly misleading advertising claims.

### (i)      "Humanely Raised"

Plaintiffs allege that Perdue's labeling of its Harvestland chicken products as "Humanely

Raised" violates the NJCFA by misleading consumers into believing that its "products are different

from those of its competitors in that the animals it uses are treated humanely <u>before and during</u>

<u>slaughter</u>." Compl., ¶ 74 (emphasis added).   Perdue engaged in this deceptive marketing, Plaintiffs

allege, in order to increase its sales of "all Harvestland . . . chicken products." <u>Id.</u> at ¶ 76.   According

to the Amended Complaint, Perdue's use of the label caused the Plaintiffs an ascertainable loss by

charging them "a premium for" Perdue's chicken products. <u>Id.</u> at ¶ 77. In support of the contention

that Perdue actually engaged in inhumane raising and slaughtering practices, Plaintiffs allege that

23

audits of "various Perdue facilities used to produce chicken products ultimately marketed as 'Humanely Raised'" exposed Perdue's inhumane raising and slaughtering processes. Id. at ¶ 34.

Specifically, the Amended Complaint alleges, Perdue allowed live chicks suffocate in the trash, Perdue abused chickens during catching and transportation, and Perdue kept live birds in the "Dead on Arrival" bins for deceased birds, among other forms of mistreatment. Id. See also id. at ¶ 35 (live chicks in hatchery waste stream, excessive ammonia levels in growout sheds, and slaughter practices that force chickens to undergo excessive pain); id. at ¶ 41 (sleep deprivation to encourage abnormal growth); ¶ 42 (chicks thrown to floor as mechanically separated from their shells shortly after hatching); ¶ 43 (gait defects suggest inhumane raising). Furthermore, with respect to slaughtering of chickens in particular, the Amended Complaint alleges that Perdue electrically shocked the chickens before they were unconscious, id. at ¶ 37, and that Perdue crammed chickens into trucks for hours while they awaited slaughter, id. at ¶ 40, among other types of inhumane treatment.

At first blush, the "Humanely Raised" label allegations appear to satisfy Rule 9(b) by specifying who made the allegedly misleading statement, when the statement was made, the precise wording of the statement, and where it was made. The Amended Complaint alleges specific dates upon which Plaintiffs Hemy and Connor purchased Harvestland chicken products. See Compl. ¶ 3 ("[s]tarting in September 2009 . . . Perdue has . . . advertised its . . . chicken . . . as 'Humanely Raised'"); id. at ¶ 11 (stating that Hemy purchased Harvestland products on May 14, 2010, July 6, 2010, and July 26, 2010); id. at ¶ 14 (stating that Conner purchased Harvestland products on February 2 , 2010, February 14, 2010, March 15, 2010, and March 22, 2010). The allegedly misleading statement—"Humanely Raised"—is identified as having been placed as a label on the

24

chicken product packaging on those dates.

Further, the allegations state with particularity the location of purchase—Hemy purchased the chicken at the B.J.'s Wholesale Club in Old Bridge, New Jersey, and Connor purchased chicken at the B.J.'s Wholesale Club located in Watchung, New Jersey. Id. at ¶ 11 (providing exact address); id. at ¶ 14 (same). Accord Lieberson, supra at *6 (holding that Rule 9(b) met where plaintiff alleged that "clinically proven" label on baby bath product was misleading); Solo v. Bed Bath & Beyond, Civ. No. 06–1908, 2007 WL 1237825, at *3 (D.N.J. Apr. 26, 2007) (holding that Plaintiff had adequately plead unlawful conduct under the NJCFA where Plaintiff alleged that Defendant misrepresented, in its advertising and packaging, that the linens purchased by Plaintiff had thread counts of at least double their actual thread counts). That said, though these allegations appear to satisfy Rule 9(b), they must nonetheless be dismissed for the following reasons.

### (A)    Harvestland Products Only

While Plaintiffs' allegations specify the "who, what, and when" of the allegedly misleading "Humanely Raised" labels, the allegations fail to distinguish between Harvestland and Perdue-branded chicken products. This creates a major stumbling block for Plaintiffs because they have standing to bring challenges only as to the Harvestland chicken products. As noted, Plaintiffs' assertion that Perdue actually engaged in inhumane practices rests on allegations that audits of "various Perdue facilities used to produce chicken products ultimately marketed as 'Humanely Raised'" revealed that Perdue engaged in inhumane treatment of its chickens during the raising and slaughtering processes. Compl. ¶¶ 34-35 (alleging that audits revealed live chicks suffocating in the trash, abuse of birds during catching and transportation, live birds kept in the "Dead on Arrival" bins, etc.). On its face, this allegation is not limited to Harvestland products; it states that "various Perdue

25

facilities" were included in the audits and it is not clear whether any, all, or none of these "various" facilities were Harvestland facilities. Nor does the Amended Complaint explain whether Perdue separately or jointly raises and slaughters chickens that make up the Harvestland products with the chickens that make up the Perdue-branded products. Adding further confusion to the scope of Plaintiffs' allegations, Plaintiffs assert that Perdue utilized the "Humanely Raised" label with "all Harvestland and some Perdue fresh chicken products," in order to increase sales. Id. at ¶ 76.

In light of Plaintiffs' failure to limit their allegations of inhumane treatment and slaughtering to Harvestland products, the NJCFA claim must be dismissed.[8]  Because Plaintiffs' allegations may be potentially remedied by amending their pleading to provide more details about the audits and Perdue's practices, but limited to Harvestland products only, the Court will grant Plaintiffs 30 days to file a Second Amended Complaint asserting a NJCFA claim based on the "Humanely Raised" label, which amended pleading conforms to the dictates of this Opinion.

### (B)    Slaughter Allegations

For the sake of completeness, I address Perdue's additional argument that Plaintiffs' allegations are insufficiently particularized because they largely focus on the slaughtering process. According to Perdue, its advertising claim that the chickens were "Humanely Raised" has nothing to do with how it slaughters its chickens. While the Amended Complaint contains some allegations relating solely to what Perdue would consider the chicken raising process, many of Plaintiffs' allegations focus on the slaughtering process. See Compl. at ¶¶ 36-40 (slaughter-based allegations).

---

[8]      In addition, Plaintiffs did not plead other details about the audits, including, but not limited to, the dates of the audits, or the names of the audited facilities. Thus, Plaintiffs not only have failed to link the audits to the Harvestland products, but have also failed to allege that the audits were done during the same time frames when Plaintiffs were making their purchases.

Simply put, Perdue's position is that the slaughter allegations have nothing to do with Plaintiffs' claim that the chickens were not raised in a humane fashion. Although Plaintiffs do include some allegations that clearly relate to the chicken raising process, see supra at section III.B.2.i.(A), nonetheless, in light of the substantial focus and predominance the Amended Complaint places on Plaintiffs' slaughter allegations, Plaintiffs' claim that "Humanely Raised" suggests to a reasonable consumer that the chickens would be humanely slaughtered warrants discussion.

Perdue points to several sources in support of its position that a reasonable consumer would not interpret "Humanely Raised" to include the slaughtering process. Perdue first cites to the dictionary definition of "raised," which does not encompass slaughtering. See e.g., Merriam-Webster Dictionary Online, available at www.merriam-webster.com/dictionary/raise (definition 5) cited in Def. Mov. Br. at 15 (defining raise as "to breed and bring (an animal) to maturity"). Perdue also cites a federal Department of Labor regulation governing wage and hour exemptions applicable in the agricultural processing industry, which states that "[t]he 'raising' of poultry includes the breeding, hatching, propagating, feeding, and general care of poultry. Slaughtering, which is the antithesis of 'raising,' is not included." 29 C.F.R. § 780.125X. Lastly, Perdue cites a USDA Agricultural Marketing Service regulation explicitly stating that "[r]aised means[,] in the case of . . . chicken . . ., the period of time from birth until slaughter."

Perdue is correct in that these sources demonstrate that, in many contexts, the commonly understood definition of raising does not include slaughter. And, Plaintiffs' argument that this Court should not consider Defendant's reference to dictionary definitions is misplaced. Indeed, the New Jersey Supreme Courts has relied upon standard dictionary definitions in interpreting a term alleged in a complaint. See Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739 (1989) (on

27

a motion to dismiss, relying upon dictionary definition of "rip off" in interpreting the allegedly defamatory statement that plaintiffs "ripped off" a client). Moreover, the government regulations, while not binding here, indicate that governmental entities interpret the term "raising" as distinct from "slaughtering." Thus, the meaning Plaintiffs would have the Court attach to "raised" is not the commonly understood definition of that term. In such circumstances, the plaintiff must incorporate allegations explaining the basis for a reasonable consumer having a different interpretation—merely the Plaintiffs' ipse dixit does not suffice.

Turning to the Amended Complaint, Plaintiffs essentially allege, repeatedly, that no reasonable consumer would expect that chickens who were "Humanely Raised" would be slaughtered in ways described in the pleading as inhumane. The conclusory connection drawn fails to explain why the ordinary meaning of "raised" should be broadened to include slaughter. Plaintiffs attempt to link slaughtering with raising chickens by first pointing to its allegations that Perdue's chicken practices are based on the NCC Guidelines, which govern the treatment of chickens from hatching through slaughter. Compl., ¶ 5. Plaintiffs argue in their brief that Perdue's compliance with its internally-developed guidelines, which are based on the NCC Guidelines, is Perdue's basis for advertising that its chickens are "Humanely Raised."[9]  But Plaintiffs make no such assertion in the Amended Complaint, and they may not amend their complaint through briefing. Commonwealth of Pennsylvania, Ex Rel. Leroy S. Zimmerman, v. Pepsico, Inc., 836 F.2d 173, 182 (3d Cir. 1988). Furthermore, that Perdue based its practices on guidelines that span the process from raising to slaughter, does not mean that the guidelines equate those two typically distinct concepts, nor do

---

[9]      Indeed, while I must focus my analysis on the allegations in the Amended Complaint, Perdue acknowledged in its briefing that the NCC Guidelines were the "jumping off point" for its own guidelines.

Plaintiffs allege that the guidelines do so. Thus, Plaintiffs' reliance on Perdue's alleged use of the NCC Guidelines is insufficient to allege that "Humanely Raised" encompasses the slaughtering process.

Second, Plaintiffs allege that they purchased the chicken products "based upon the representations that the Harvestland chicken was "Humanely Raised" [and that] had [they] known the truth that the chicken was not in fact treated humanely . . . before and during slaughter," they would not have purchased the chicken. Id. at ¶¶ 11- 16 (emphasis added). This allegation is also conclusory and, furthermore, it does not expressly allege that either Plaintiff interpreted "raised" to include slaughtering. In order for Plaintiffs to adequately plead that raising includes slaughtering, supporting facts are required; "a complaint must do more than allege the plaintiff's entitlement to relief . . . [it] has to 'show' such an entitlement with its facts." Fowler, 578 F.3d at 211. Plaintiffs' conclusory allegations that they assumed raised included slaughtering does not meet this standard.

Finally, Plaintiffs allege that a reasonable consumer would interpret "Humanely Raised" to encompass a manufacturer's slaughtering practices. Id. at ¶¶ 36-44. This allegation is also conclusory because Plaintiffs do not allege any facts in support of this assertion. For example, paragraph 37 reads:

> No reasonable consumer would expect that chickens who were "humanely raised" would have been **electrically shocked before being effectively rendered unconscious, if they are at all, by such electric "stunning."** But in fact the chickens that Perdue raises are subject to electric shocking . . . Scientific studies, including published peer reviewed articles in The Veterinary Record . . . have shown that many birds experience painful electric shocks prior to being stunned ....

Id. at ¶ 37 (emphasis in original). To properly plead the intent of a group of consumers, a plaintiff

must put forth concrete facts from which the Court can determine the plausibility of that allegation. Cf. Food Sciences Corp. v. Nagler No. 09-1798, 2010 WL 4226531, *2 (D.N.J. Oct. 20, 2010) ("[W]hen an element of a claim involves some abstract fact, including those dealing with mental states such as questions of intent or likelihood of confusion, the factual conclusion cannot simply be asserted in the complaint, but must be sufficiently grounded in more concrete factual allegations.") (citing Iqbal, 129 S.Ct. at 1951). Plaintiffs' allegations, in contrast, merely state in a conclusory fashion what consumers would expect. Such a conclusory statement is not entitled to a presumption of truth under modern pleading standards. See Iqbal, 129 S.Ct. at 1951.

This same analysis applies to the remainder of Plaintiffs' "reasonable consumer" allegations, which contain gory details about specific alleged slaughtering practices, along with results of neuroscience and other scientific studies that discuss the effects of such practices on chickens. See Compl., ¶¶ 36-40. For example, Plaintiffs allege that "[n]o reasonable consumer would expect that chickens who were 'humanely raised' would have been traumatized by **painful and terrifying handling and shackling at slaughter plants that can break bones and dislocate joints.**" Id at ¶ 36 (emphasis in original). Thereafter, in that same paragraph, Plaintiffs discuss studies finding that the upside-down shaking of chickens is painful, traumatic, and stressful, and causes chickens to flap their wings, which results in broken bones and dislocated joints. Id

Plaintiffs' summary of the content of scientific studies does not provide factual support for their assertion that no reasonable consumer would expect that humanely raised chickens would be subjected to inhumane slaughter. Indeed, these allegations do nothing to connect the humane raising of chickens with how they are slaughtered. At best, these allegations may provide factual support for Plaintiffs' assertion that Perdue's slaughtering practices, in and of themselves, may be

30

inhumane.[10] But the link connecting these allegedly inhumane slaughtering practices with Plaintiffs' claim that Perdue humanely raised its chickens is missing.[11]

Reading Plaintiffs' Amended Complaint, one is left with the impression that what Plaintiffs are attempting to allege is that the "Humanely Raised" label is misleading because reasonable consumers would believe that a company that humanely raises its chickens also humanely slaughters its chickens. However, Plaintiffs have not plead any facts from which the Court could infer that the "Humanely Raised" label reasonably fosters such a belief. At its core, the Amended Complaint's claim that humanely raised necessarily includes slaughtering is conclusory, and thus the slaughter allegations do not support Plaintiffs' NJCFA claims.

### (C)    Ascertainable Loss

Should Plaintiffs choose to replead, they would also need to sufficiently allege ascertainable loss. To plead ascertainable loss under the NJCFA, a plaintiff must allege loss that is "quantifiable

---

[10]    In this connection, Perdue challenges Plaintiffs' allegation that Perdue's practice of "cramming" chickens into trucks for hours while they await slaughter, Compl., ¶ 40, is inhumane by citing to a New Jersey Administrative Code regulation that permits poultry to be transported and confined in a vehicle for up to 28 consecutive hours. The Court does not address in this Opinion whether or not this particular practice, or any other, is humane, but merely notes here that Plaintiffs rely on these sort of allegations in support of their assertion that Perdue inhumanely treated its chickens.

[11]    In addition, some of Plaintiffs' allegations state that they are made "upon information and belief." See Compl., ¶ 49 ("Upon information and belief, Perdue has not changed the treatment of any of its . . . chickens . . . , and the purported welfare standards upon which Perdue bases its "Humanely Raised" claim are nothing more than minimal standards ...."). Perdue argues that Rule 9(b) precludes Plaintiffs from asserting allegations of fraudulent or misleading conduct in that fashion. Case law has held that Rule 9(b) requires more particularized allegations; "it is well settled that Rule 9(b) applies even when the fraud relates to matters within the knowledge of the defendant and that allegations based on information and belief do not satisfy Rule 9(b) unless the complaint sets forth the facts upon which the belief is founded." Zavala v. Wal-Mart Stores, Inc., 393 F.Supp.2d 295, 312 (D.N.J. 2005) (emphasis added). Plaintiff should take this case law into consideration in connection with any amended pleading they may decide to file.

Case 3:11-cv-00888-FLW -LHG   Document 29   Filed 11/30/11   Page 32 of 44 PageID: 680

or otherwise measurable." <u>Thiedemann v. Mercedes–Benz USA, LLC</u>, 183 N.J. 234, 872 A.2d 783, 792 (2005).  In that connection, Plaintiffs' allegations must provide "enough specificity as to give the defendant notice of possible damages." <u>Torres–Hernandez</u>, 2008 WL 5381227, at *7, 2008 U.S. Dist. LEXIS 105413, at *19.  To be clear, "what New Jersey Courts require for that loss to be 'ascertainable' is for the consumer to <u>quantify the difference in value between the promised product and the actual product received.</u>"  <u>Smajlaj v. Campbell Soup Company</u>, 782 F.Supp.2d 84, 99 (D.N.J. 2011) (emphasis added)

In the Amended Complaint, while Plaintiffs allege that they would not have purchased the chicken products if they had known that Perdue inhumanely raised and slaughtered its chickens, <u>see</u> Compl. ¶ ¶ 13, 16, they do not set out the difference in value between the promised product (humanely treated chicken products) and the actual product received (inhumanely treated chicken products).   Nor have Plaintiffs alleged the price of competing chicken products, as a means of pleading the difference in value.  They allege only that they paid a "premium" for Perdue's products "when, in fact, they were not and are not treated differently from Perdue's other chickens or differently in any material respects of other major producers." Compl., ¶ 77.  As I explained in my recent decision in <u>Lieberson</u>, "the Court finds that absent any specific information concerning the price of the [p]roducts or the price of any comparable products, Plaintiff's allegations concerning the ascertainable loss are nothing more than unsupported conclusory statements that are insufficient to withstand a motion to dismiss." 2011 WL 4414214 at *8.  <u>Compare</u> <u>Smajlaj</u>, <u>supra</u> at 102 (finding ascertainable loss sufficiently pled where plaintiffs alleged that "the soup they paid for is identical . . . to soup that is 20 to 80 cents cheaper, and they bought it based on a misrepresentation.")  That was not done here.  There are no facts supporting a claim for ascertainable loss—other than the use

32

of the term "premium" price.

In sum, for the foregoing reasons, Plaintiffs' NJCFA claim based on the "Humanely Raised" allegations regarding the Harvestland brand chicken products is dismissed without prejudice. Plaintiffs are granted 30 days to file an amended pleading consistent with the dictates of this Opinion.

### (ii)     "Raised Cage Free"

Perdue also challenges the "Raised Cage Free" NJCFA allegations found in the Amended Complaint. As an initial matter, the Court notes that, as with Plaintiffs' "Humanely Raised" NJCFA allegations, Plaintiffs do not limit their "Raised Cage Free" allegations to only Harvestland products. Moreover, Plaintiffs do not otherwise plead their NJCFA "Raised Cage Free" allegations with particularity sufficient to satisfy Rule 9(b)'s pleading standard. In paragraph 50 of the Amended Complaint, Plaintiffs allege that this label "misleads consumers into thinking that [Perdue's Harvestland] products are different and 'better' than others ...." Limiting its allegation in this fashion, the Amended Complaint does not even attempt to dispute the fact that Perdue does not cage its chickens. Rather, Plaintiffs allege that the "Raised Cage Free" advertising claim is misleading despite its accuracy. In other words, Perdue allegedly uses the cage free designation as a means of distinguishing itself from its competitors when, in fact, its raising practices do not treat chickens differently "in any material respects" from chickens raised by other major producers. See e.g., Compl. ¶ 75.

For one, Plaintiffs have not pointed to any case law suggesting that using an accurate advertising phrase to promote oneself is actionable under the NJCFA. Were Plaintiffs alleging that Perdue did not actually keep its chicken outside of cages, such an allegation could form the basis of

an NJCFA claim.  Here, by contrast, Plaintiffs attempt to allege that Perdue falsely claims that its

chickens are treated better than the chickens raised by other producers.  Yet, Plaintiffs have not

alleged any facts about the practices of these "other producers."  Furthermore, Plaintiffs do not allege

that Perdue compares itself to other producers of chicken or that Perdue claims that it stands alone

in raising cage free chicken.  This, against the backdrop that Plaintiffs do not challenge the accuracy

of the "Raised Cage Free" label, cause the Court to conclude that Plaintiffs have not sufficiently

alleged that the label itself is misleading or confusing.  Therefore, Plaintiffs' NJCFA claims based

on the "Raised Cage Free" advertisement are dismissed for failure to satisfy Rule 9(b)'s heightened

pleading standard.  Because the Court can not conceive of any additional facts that Plaintiffs could

plead in support of their claim to render it viable, and Plaintiffs have not suggested any to the Court,

the Court dismisses these allegations with prejudice.

### (iii)    USDA Process Verified Shield

Plaintiffs allege that Perdue's placement of the USDA Process Verified shield alongside the

"Humanely Raised" and "Raised Cage Free" labels on the chicken products mislead a reasonable

consumer into believing that the veracity of those claims have been confirmed by an independent

government body.  See Compl. ¶ 52.[12]  Specifically, Plaintiffs assert that Perdue utilized several

marketing tactics to "tout" that the USDA had verified that its chickens are humanely raised.  For

example, Plaintiffs allege, Perdue distributed in-store signs and placards, as well as brochures,

---

[12]     Perdue argues in its reply brief that this allegation is a new "theory" asserted in
Plaintiffs' opposition papers, suggesting that Plaintiffs did not plead this allegation in the Amended
Complaint.  To the contrary, this allegation is found in paragraph 52 of the Amended Complaint,
which explicitly states "The placement of the USDA shield alongside the "Humanely Raised" and
"Raised Cage Free" claim would lead a reasonable consumer to believe that the truth of that claim
had been certified by a reputable and unbiased third party.  However, this is not the case."  Id.

stating "We've always known our Perdue chicken is good and with our new USDA Process Verified seal, now we know it's Verifiably Good." Id. at ¶ 53A.  By way of further example, Plaintiffs allege that Perdue's website and Facebook page stated that the USDA Process Verified shield means that consumers "can have full confidence in the way we raised our chickens ...." Id. at ¶ 53B.  See generally id. at ¶ 53 (listing additional examples).  Plaintiffs also allege that a Perdue employee stated, in a November 30, 2010 New Jersey Star-Ledger newspaper article, that "[t]he USDA Process Verified Program, which is audited by the USDA, verifies that we are exceeding the industry standards.". Id. at ¶ 54.

There are several problems with Plaintiffs' USDA shield allegations.  First, as with the "Humanely Raised" and "Raised Cage Free" allegations, they do not properly distinguish between Harvestland and Perdue-branded products.  Second, many of Plaintiffs allegations do not contain specific facts from which it could be inferred that Perdue's advertising statements suggested to a reasonable consumer that the USDA certified Perdue's use of the "Humanely Raised" and "Raised Cage Free" labels.  Consider the newspaper article, for example.  In the article, a Perdue employee allegedly stated that "[t]he USDA Process Verified Program, which is audited by the USDA, verifies that we are exceeding the industry standards." Id. at ¶ 54 (emphasis added).  Stating that Perdue is exceeding industry standards does not suggest that the USDA verified that Perdue is humanely raising its chicken or raising them outside of cages.[13]  By way of further example, the advertising

---

[13]     In addition, while the newspaper article allegations include the date the article was published, the title of the newspaper article and the exact website address where the article was located, see Compl., ¶ 54, Plaintiffs do not allege that they personally read the Star Ledger article. Plaintiffs argue in their briefing, without citing authority, that they may plead a NJCFA claim by simply asserting that a reasonable consumer would have been mislead by Perdue's advertisements. See Pl. Opp. at 27. Contrary to Plaintiffs' contention, it is not sufficient for a plaintiff to plead "what happened to most purchasers [or] what happened typically." Rolo, 155 F.3d at 658 (internal

phrase "[w]e've always known our Perdue chicken is good and with our new USDA Process Verified seal, now we know it's Verifiably Good," does not speak to Perdue's use of the "Humanely Raised" and "Raised Cage Free" labels.

The only allegedly fraudulent or misleading statements that specifically address the label use are Plaintiffs' allegations that Perdue stated on its website and Facebook page that Perdue is "the only poultry company with third-party audits by the USDA to ensure humane treatment of [its] birds," and that Perdue urges shoppers to "look for third-party verification of any non-USDA defined term used on poultry packaging." Id. at ¶ 53B. These allegations, however, do not satisfy Rule 9(b)'s heightened pleading standard because the Amended Complaint does not put forth any specific facts about when these statements were posted on Perdue's website and Facebook pages. This is insufficient under Third Circuit law. See Frederico, supra at 200 (noting that a plaintiff must allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."). In addition, it is not clear from Plaintiffs' allegations that they personally viewed the website or Facebook page prior to their purchases. This is problematic because a plaintiff may not simply assert generalized facts, but must allege facts specific to himself or herself. See Rolo, 155 F.3d at 658–59 (dismissing allegations for failure to satisfy Rule 9(b) where the complaint did not allege what actually happened to either of the plaintiffs).

Lastly, Perdue further argues that Plaintiffs' NJCFA claim may not be premised on the shield

---

quotation marks omitted). "While such pleading may be consistent with claims under Rule 8(a), it fails to provide the particularity required by Rule 9(b)." Cooper v. Samsung Electronics America, Inc., No. 07-3853, 2008 WL 4513924 (D.N.J. Sept. 30, 2008). Rather, "plaintiffs must allege what happened to them . . . and should include some allegations of what was said to them to induce them to purchase" the product. Rolo, 155 F.3d at 658. Thus, the USDA shield-newspaper allegations also do not satisfy Rule 9(b)'s particularized pleading standard.

because Perdue was granted permission from the USDA's Agricultural Marketing Service to place the shield on its packaging. Indeed, Perdue has provided the Court with a printout from the USDA Process Verified Program's website that includes Perdue on the list of authorized manufacturers and the Court may take judicial notice of that public record. Even though the Court may not consider that exhibit for the truth of the matter asserted on a motion to dismiss, Plaintiffs do not dispute that Perdue obtained permission to affix the shield to its products. However, that Perdue was granted permission to use the shield does not completely undermine Plaintiffs' allegation that the combination of the shield and the "Humanely Raised" and "Raised Cage Free" labels created the impression in their minds that an unbiased third party was certifying Perdue's claims. Rather, what is missing from Plaintiffs' Amended Complaint are allegations that the USDA-shield misrepresentations are related to Perdue's use of the "Humanely Raised" and "Raised Cage Free" labels, and with respect to the website and Facebook allegations in particular, Plaintiffs have failed plead those allegations with particularity.

In sum, Plaintiffs have standing only to assert Harvestland-branded products, yet their NJCFA claims are based allegations related to both Harvestland and Perdue-branded products. For this reason alone, their NJCFA claim must be dismissed. In addition, Plaintiffs' allegations do not satisfy Rule 9(b)'s pleading standard. To be clear, the only allegations that may potentially be re-pled are the "Humanely Raised" allegations and the USDA shield website and Facebook allegations. In addition, while the Court is granting Plaintiffs leave to amend the NJCFA claims, as set forth above, Plaintiffs are advised to ensure that any amended pleading addresses the concerns outlined in this Opinion and is otherwise legally sufficient, including pleading ascertainable loss. No further

37

leave to amend will be granted.[14]

### 3.    Common Law Fraud

Plaintiffs' common law fraud claim is based on the same facts asserted in connection with their NJCFA claim, except that Plaintiffs limit their claims to the "Humanely Raised" label use. The elements of common law fraud under New Jersey law are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Triffin v. Automatic Data Processing, Inc., 394 N.J.Super. 237, 246 (App. Div. 2007) (citing Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997)).  Of these, "[m]isrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." Banco Popular North America v. Gandi, 184 N.J. 161, 174 (2005).  Perdue argues that Plaintiffs' fraud claim fail to adequately plead materiality and reliance.

As with the NJCFA claims, Plaintiffs allegations do not distinguish between Harvestland and Perdue-branded products. Moreover, because fraud claims are governed by Rule 9(b), my Rule 9(b) analysis of Plaintiffs' NJCFA claim applies here as well. For that reason, Plaintiffs' fraud claims based on the "Raised Cage Free" allegations are dismissed with prejudice and Plaintiffs are granted leave to amend the "Humanely Raised" and USDA-shield website and Facebook allegations.

### 4.    Negligent Misrepresentation

Perdue argues that Plaintiffs' negligent misrepresentation claims should be dismissed for the same reasons as the fraud and NJCFA claims.  The elements of a negligent misrepresentation claim

---

[14]    While the Court did not address Defendant's materiality and causal connection arguments in the context of Plaintiff's NJCFA claims, Plaintiff should consider these arguments as well in fashioning any amended pleading.

are similar to fraud and NJCFA claims, but they are not the same. Unlike with common law fraud, "[t]o prevail on a negligent misrepresentation claim in New Jersey, a plaintiff must prove that the defendant negligently made an incorrect statement, upon which the plaintiff justifiably relied," whereas a common law fraud claim requires that the misrepresentation have been intentional. St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n, No. 04-4540, 2005 WL 1199045 (D.N.J. May 18, 2005) (discussing New Jersey law)  Nevertheless, like common law fraud, Plaintiffs must allege reasonable reliance and the other elements. As compared to the NJCFA, the negligent misrepresentation claim differs in that no ascertainable loss or causal connection need be pled. Cf. Varacallo v. Massachusetts Mut. Life Ins. Co., 332 N.J.Super. 31, 43 (App. Div. 2000) (contrasting NJCFA and common law fraud claims). Moreover, Rule 9(b) applies to those negligent misrepresentation claims that sound in fraud, District 1199P Health and Welfare Plan v. Janssen, L.P., 784 F.Supp.2d 508, 532 (D.N.J. 2011), which Plaintiffs' claims do here.[15]

The allegations supporting this claim, like the others, fail to distinguish between Harvestland and Perdue-branded products and fail to fully satisfy Rule 9(b). Accordingly, Perdue's motion to dismiss the negligent misrepresentation claims is granted and Plaintiffs' may file an amended pleading, consistent with this Opinion, within 30 days of the date of this Opinion.

### 5.    Unjust Enrichment

Perdue argues that Plaintiffs' unjust enrichment claims should be dismissed because "New Jersey law does not recognize unjust enrichment as an independent tort cause of action," and "where a plaintiff asserts an unjust enrichment cause of action along with tort claims and there appear to be

---

[15]    As noted supra, Plaintiffs' factual allegations are the same with respect to the negligent misrepresentation, NJCFA, and common law fraud claims.

no allegations that the plaintiff expected or anticipated remuneration from the defendant, the unjust enrichment claim should be dismissed." Torres-Hernandez, 2008 WL 5381227 at *9 (emphasis added). In Perdue's view, Plaintiffs' unjust enrichment claims fail because they do not allege that they expected remuneration at the time they purchased the products from B.J.'s Wholesale Club. Def. Open. Br. at 22. Perdue, further, argues that the unjust enrichment claims fail because there was no direct relationship between Plaintiffs and Perdue; Plaintiffs purchased the chicken products through a retailer, not from Perdue directly.

On these points, Perdue is correct. As an initial matter, while an unjust enrichment claim need not be pled with the same specificity as a claim sounding in fraud, a plaintiff must adequately plead that "(1) at plaintiff's expense, (2) defendant received benefit, (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." Torres-Hernandez, 2008 WL 5381227 at *9 (quoting In re K-Dur Antitrust Litigation, 338 F.Supp.2d 517, 544 (D.N.J. 2004) (quoting RESTATEMENT OF RESTITUTION 1 (1937))). Case law makes clear that an expectation of remuneration is required, see VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (1994) ("[t]he unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."), and Plaintiffs have plead no such allegations here. Accord Castro v. NYT Television, 370 N.J.Super. 282, 300 (App. Div. 2004) (dismissing unjust enrichment claim where "plaintiffs never expected any remuneration from the [defendant]"). This makes sense in that the purpose of the unjust enrichment theory is to ensure that plaintiffs who were not paid for their services receive the payment to which they are entitled. See Callano v. Oakwood Park Homes Corp., 91 N.J.Super. 105 (App.Div.1966).

New Jersey case law, further, makes clear that Plaintiffs must allege a direct relationship between the parties; as explained by the court in Cooper, 2008 WL 4513924 at *10:

> although Cooper alleges that Samsung was unjustly enriched through the purchase of the television, there was no relationship conferring any direct benefit on Samsung through Cooper's purchase, as the purchase was through a retailer, Ultimate Electronics ... Cooper, therefore, did not confer a benefit on Samsung within the meaning of New Jersey's doctrine of unjust enrichment.

Id. (emphasis added) (citations omitted). This sort of reasoning has been employed by New Jersey courts. See Callano, 91 N.J.Super. at 109-110 cited in Benmoore Const. Group, Inc. v. Herod Rutherford Developers, L.L.C., No. DC-017701-08, 2009 WL 4251130, *3 (App. Div. Nov. 18, 2009). And, here, Plaintiffs have not, nor could they, allege that they had a direct relationship with Perdue.

Plaintiffs argue that, in lieu of pleading a direct relationship, they may plead a mistake, citing Callano, 91 N.J.Super. at 109. Callano, indeed, states that unjust enrichment "cases involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit." Id. However, after making this statement of law, Callano held that the plaintiff in that case did not adequately plead mistake because the plaintiff did not have any direct dealings with the defendant, and did not expect any remuneration from the defendant. Hence, the Callano court reasoned, "[n]o issue of mistake on the part of plaintiffs [wa]s involved." Id. While Plaintiffs here allege that they would not have purchased the chicken products but for Perdue's false marketing, and thereby mistakenly conferred a benefit on Perdue, according to Callano, that is not the sort of mistake that can support an unjust enrichment claim. Accordingly, Plaintiffs' unjust enrichment claims are dismissed with prejudice as the Court sees no facts upon which Plaintiffs may replead this

41

claim.

### 6.    **Breach of Express Warranty**

Under New Jersey law, a breach of express warranty claim has four elements: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." Frederico, 507 F.3d at 203. Plaintiffs allege that the "Humanely Raised" label on the chicken product packaging created an express warranty. See Compl., ¶ 97. According to Plaintiffs' allegations, "[t]he terms of that contract include the promises and affirmation of fact made by [Perdue] on its product labels and through its marketing." Id. Indeed, courts have held that an advertisement may create an express warranty. See, e.g., Cipollone v. Liggett Group, Inc., 893 F. 2d 541, 575-76 (3d Cir. 1990) rev'd in part on other grounds 505 U.S. 504, 112 S.Ct. 2608, 120 L. Ed. 2d 407 (1992) (concluding that cigarette advertisements representing that the cigarettes were safe could constitute an express warranty); Elias v. Ungar's Food Products, Inc., 252 F.R.D. 233, 252 (D.N.J. 2008) (packaging statements regarding fat and caloric content created express warranty). See also Realmuto v. Straub Motors, 65 N.J. 336, 343, 322 A.2d 440 (1974) ("While the causal relation of the end result to [a] breached guarantee must be shown, mere failure of promised performance is enough without proof of any defect.").

Perdue argues that Plaintiffs' allegations are insufficient because Plaintiffs fail to plausibly allege that the "Humanely Raised" representations are actually false. See Def. Open. Br. at 11 n.8. As an initial matter, and as noted supra, Plaintiffs' allegations are not properly limited to Harvestland products. In addition, and as explained in connection with my NJCFA analysis, Plaintiffs have failed to allege any non-conclusory facts in support of their assertion that Perdue breached its advertising-

created agreement by failing to actually humanely raise their chickens. Moreover, the Court can not discern from Plaintiffs' unspecific audit allegations, discussed in my NJCFA analysis, that Perdue actually failed to humanely raise its Harvestland chickens. And, while courts have noted that "literally true but misleading representations [may] provide the basis for a[n express warranty] claim," Smajlaj, 782 F.Supp.2d at 103, Plaintiffs have not alleged any non-conclusory facts to suggest that "Humanely Raised" is otherwise misleading.

As for Plaintiffs' "Raised Cage Free" allegations, Plaintiffs have not alleged any facts indicating that those claims were false or that Perdue failed to live up its end of the bargain. Perdue advertised that their chickens were raised cage free, and Plaintiffs have not alleged that the chickens were not. By failing to allege that Perdue made a false promise that it did not actually keep, Plaintiffs have not alleged that Perdue breached any express warranty. See Realmuto, 65 N.J. at 343 (stating an express warranty claim is based on a "failure of promised performance ....") (emphasis added). Nor have Plaintiffs alleged any non-conclusory facts to suggest that the "Raised Cage Free" label was misleading, though literally true. In my view, there are no additional facts that could be plead to revive this claim, thus, the "Raised Cage Free" allegations are dismissed with prejudice.[16]

Only the "Humanely Raised" breach of express warranty claims could potentially be re-pled in a manner that is not futile. Moreover, should Plaintiffs decide to re-plead, they must also plead damages. See Frederico, 507 F.3d at 203 (listing elements of claim). Accordingly, Defendant's motion to dismiss is granted with respect to Plaintiffs' express warranty claims as they relate to Perdue's "Humanely Raised" advertising in connection with its Harvestland chicken products.

---

[16]    It is clear from the Amended Complaint that Plaintiffs' do not assert that the USDA shield allegations fall within the breach of express warranty claim. See Compl., ¶¶ 91-95.

Plaintiffs are granted 30 days from the date of this Opinion to file an amended pleading that sufficiently addresses the aforesaid infirmities.

### C.    Motion to Strike

Perdue moves, in the alternative, under Federal Rule of Civil Procedure 12(f) to strike Plaintiffs' slaughter allegations.  As explained supra, the Court has granted Perdue's motion to dismiss.  Therefore, the Court does not reach Perdue's motion to strike.

## IV.    Conclusion

For the foregoing reasons, AWI's motion to intervene or, in the alternative, to stay is denied. Defendant's motion to dismiss is granted as follows.  As to all counts, Plaintiffs' claims are limited to the Harvestland chicken products, as opposed to the Perdue-branded products.  In addition, all claims relating to Perdue's use of the "Raised Cage Free" label are dismissed with prejudice, and Plaintiffs' unjust enrichment (Count IV) claim is also dismissed with prejudice. With respect to the remaining counts of the Amended Complaint, those counts are dismissed without prejudice and Plaintiffs are granted  leave to amend within 30 days of the date of this Opinion in a manner consistent with the dictates of this Opinion.  An appropriate Order shall follow.

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date: November 30, 2011